Pearl SNELL, Plaintiff–Appellant,

v.

Kenneth S. APFEL, Commissioner of Society Security, Defendant–Appellee,

Docket No. 97–6240.

United States Court of Appeals, Second Circuit.

Argued April 21, 1999.

Decided May 20, 1999.

John Locurto and Robin Thorner, law students appearing pursuant to Student Practice Rule Section 46(e), Washington Square Legal Services, Inc., New York, N.Y. (Lynn Martell and Claudia Angelos, of counsel) for Plaintiff–Appellant.

Maria P. Fragassi Santangelo, for Denise E. O'Donnell, United States Attorney for the Western District of New York (Arthur J. Fried, Barbara L. Spivak, of counsel) for Defendant–Appellee.

Before: KEARSE, McLAUGHLIN, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

Plaintiff-appellant Pearl Snell injured herself in a fall in July 1991 and has not worked since that date. On the basis of the physical disability that she alleges resulted from that fall, Snell claimed to be entitled to Social Security Disability Insurance ("SSDI"). An administrative law judge ("ALJ") found that Snell was not entitled to SSDI payments on the basis of any physical disability. The ALJ also found, however, that Snell suffers from psychological impairments that render her unable to work, and, as a result, he awarded her SSDI benefits. The Social Security Administration's Office of Hearings and Appeals (the "Appeals Council") reviewed

the case on its own motion, reversed the decision of the ALJ, and denied benefits to Snell.

Snell sought review in the United States District Court for the Western District of New York (Telesca, *J.*),[1] and both sides moved for judgment on the pleadings. On July 24, 1997, the district court dismissed Snell's complaint, finding that the decision of the Appeals Council was supported by substantial evidence. Snell appealed. We hold that the Appeals Council failed to provide Snell with adequate reasons for its decision, that it may have ignored evidence favorable to Snell, and that the record must be more fully developed before a final determination can be made with respect to her mental impairments. We therefore vacate the judgment of the district court and remand the case to the Appeals Council for further proceedings.

## BACKGROUND

Snell held various jobs before 1991. Among other occupations, she worked as an insurance claims processor, mental hygiene therapy aide, and taxi driver. At the beginning of July 1991, she was a food services manager in a Kentucky Fried Chicken restaurant. On July 3, 1991, she fell while at work, landing on her buttocks and lower back. She sustained an injury and has not worked since.

A) Examinations and diagnoses

Snell's principal treating physician prior to 1995 was Dr. John Cooley. Initially, Dr. Cooley seemed to believe that Snell was not completely disabled as a result of the accident: on April 9, 1992, he noted that "it seems realistic for [Snell] to begin to identify restricted, part-time activity that she could pursue," though that would probably require some kind of retraining. He later became less optimistic. On August 6, 1993, Cooley wrote in a letter to the New York State Worker's Compensa-

tion Board that Snell suffered from "chronic lumbar strain, resulting in total disability for her previous or any other work." He also added, however, that she might become able to work again with proper conditioning, but he described that prognosis as "guarded." Later, on March 8, 1994, Cooley submitted a report to the Worker's Compensation Board stating that Snell was "participating in schooling for sedentary work appropriate to her limitations."

Snell was also treated on at least three occasions by Dr. Linda Clark. On February 16, 1995, Dr. Clark found that Snell could sit for up to six hours per day and could stand for the same length of time. On March 9, 1995, Clark said that Snell could stand for up to four hours in an eight-hour workday and could sit for up to three hours. On August 3, 1995, Dr. Clark reported that Snell could stand for only two hours during an eight-hour workday and could sit for not more than four hours.

Several other physicians examined Snell in consultative capacities. They seemed to believe that Snell was not permanently disabled, and several took a skeptical view of her symptoms. The first of these consultants was Dr. Lynn Myers, who examined Snell on October 3, 1991. Dr. Myers reported "mild decreased range with flexion" but few other abnormalities. She also noted that Snell "was able to ambulate to and from the examining room wearing high heeled shoes without any noted difficulty or reported increased complaints of her low back pain." Dr. Myers diagnosed Snell as having low back strain and "psychological factors influencing illness," but she did not explain what those psychological factors might be.

On June 1, 1992, Dr. John Devanny examined Snell's back, conducting a physical exam and taking X-rays. He wrote that "it is hard to explain exactly why she

---

1. The decision of which Snell sought review was the decision of the Appeals Council, but the named party against whom she brought suit was, as is proper, the Commissioner of Social Security.

has had such a prolonged disability from a fall with essentially a normal exam. I would feel that she only has a mild, partial disability at this time." One year later, on June 1, 1993, a report from the University of Rochester Medical Center concluded that "Snell could return to full time employment in a[l]ight duty job following successful completion of an active Comprehensive Work ReEntry Program." Also in July 1993, Dr. Andre Lefebvre reported that Snell "walked normally to the examining site" but then "had a waddling gait when she was officially examined." In a similar vein, he wrote that Snell's ability to flex and bend was somewhat restricted during the official examination but that "[s]he flexed considerably more just assessing the examining table and climbing on the foot stool." He concluded that Snell had a "[s]ubjective continued low pain back syndrome with absence of reproducible reliable physical findings" and a "very mild partial disability on the basis of her subjective complaints and inconsistent, non-reproducible physical findings." Dr. Lefebrve found Snell "employable in a semi-sedentary capacity."

Another consultative examination performed two years later was consistent with the four evaluations described above. On September 19, 1995, Dr. Bharat Gupta conducted a physical exam and took X-rays. He reported that he observed Snell walking down the hallway before she knew herself to be officially under examination and that she exhibited "no distress." His examination found "minimal restriction of movements ... but her subjective symptoms of pain are way out of proportion to her physical findings."

Snell also underwent a psychological exam, conducted by Dr. Nelson Freeling on September 21, 1995. Dr. Freeling diagnosed Snell as having "[p]assive aggressive personality disorder" and "[s]omatoform

pain disorder," the latter meaning that she experiences pain for which there is no medical explanation. He rated Snell's abilities to exercise judgment and to interact with supervisors as "poor or none." He specifically found, however, that "there is no indication of any significant cognitive or regressed deterioration from a previously higher level of functioning."

Finally, the record contains a letter from Dr. Karen Gardner Moore to the Appeals Council, dated May 13, 1996. The letter says, among other things, that Snell suffers from depression and is unable to stand for more than two or sit for more than four hours out of a workday. The letter does not say, however, whether Dr. Moore conducted an examination herself or whether she was transcribing Snell's reports or the findings of other physicians.

B) Procedural history

Snell applied for SSDI on July 24, 1993. The application was denied, as was a request for reconsideration. On February 23, 1995, Snell had an administrative hearing before ALJ Stanley A. Moskal, Jr.[2] The ALJ determined that Snell was covered by SSDI through December 31, 1993, and could receive disability insurance payments only if she had a qualifying disability at or before that date. The ALJ then found Snell to be disabled and granted benefits.

Acting *sua sponte*, the administrative Appeals Council vacated the ALJ's ruling and remanded for a new hearing. The second hearing was held on December 4, 1995. In a decision dated March 22, 1996, ALJ Moskal again ruled for Snell. He noted that Snell's "exertional capacity," meaning her physical condition, warranted a conclusion of "not disabled." But he found that Snell had "nonexertional limitations," meaning mental or psychological troubles, that would keep her from being

---

**2.** Snell claims that she appeared before the ALJ *pro se*. **Blue 47–48.** The record indicates that she was represented at the first ALJ hearing but not at the second. **A77, A94.**

Snell states that the representative, Sylvester Thomas, was a "friend and non-lawyer" and that she should be treated as having appeared without legal representation. **Blue 3.**

able to work. The ALJ specifically wrote that "the record shows that the claimant's mental impairments are all that currently prevent her from reentering the workforce in some simple, entry level unskilled sedentary position."

The ALJ repeated Dr. Freeling's determinations that Snell was passive-aggressive, exhibited somataform pain disorder, showed poor judgment, and had poor ability to interact with supervisors. These factors were important to the ALJ's conclusion that Snell's "non-exertional limitations" prevented her from holding a job. At the hearing, the ALJ examined a vocational expert named Julie Andrews. The ALJ asked the vocational expert to comment on the employability of a series of hypothetical persons whose conditions approximated what the record might show about Snell. In response to all but the last two hypotheticals, the vocational expert said that such a person could indeed hold a job and identified what those jobs would be. At the end of his examination, however, the ALJ posed two hypotheticals in which the subject's ability to exercise judgment, to demonstrate reliability, and to interact with supervisors was "poor or none." The vocational expert said that such a person could not hold any available job. On the basis of that assessment, the ALJ awarded benefits.

On June 13, 1996, the Appeals Council *sua sponte* reconsidered and reversed the ALJ's decision. On the question of physical impairment, the Appeals Council noted the absence of any medical evidence of an injury severe enough to prevent Snell from doing light work. The Council further wrote that it had considered Snell's subjective reports of pain but that the record contained no medical or laboratory findings of conditions that could reasonably be expected to produce the symptoms Snell reported. The Appeals Council acknowledged that Snell might have a mental impairment, but it found that the record "contains no indication of any mental impairment on or before December 31, 1993,"

the date on which Snell's SSDI coverage lapsed. Alternatively, if there had been a mental impairment before that date, the Council said that the record contained "no indication that the claimant's mental impairment resulted in limitations in her daily activities, social functioning, or in concentration, persistence, and pace."

On December 11, 1996, Snell sought review in the United States District Court for the Western District of New York. On July 24, 1997, the district court granted judgment on the pleadings for the Commissioner.

Snell appealed *pro se* and subsequently secured the assistance of *pro bono* counsel.

## DISCUSSION

We review the Commissioner's decisions to determine whether they are supported by substantial evidence. *See* 42 U.S.C. § 405(g) (1994); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam). Our review is really of the administrative ruling rather than of the decision in the district court, because the district court's determination was governed by the same substantial evidence standard that we apply. *See Rivera,* 923 F.2d at 967.

A) Limits on deference due to treating physicians

Snell argues that the Commissioner erred by not giving controlling weight to the opinions of her treating physicians, whom she identifies as Drs. Cooley, Clark,

and Moore. The method by which the Social Security Administration is supposed to weigh medical opinions is set forth at 20 C.F.R. § 404.1527(d). The regulations say that a treating physician's report is generally given more weight than other reports and that a treating physician's opinion will be controlling if it is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record." *Id.* § 404.1527(d)(2).

■ When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given. *See Id.* § 404.1527(d)(4). Moreover, some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are "reserved to the Commissioner." *Id.* § 404.1527(e)(1). That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative.

■ Drs. Cooley and Clark are treating physicians, having each seen Snell on multiple occasions. The record is insufficient, however, to compel a conclusion that Dr. Moore is also a treating physician, because there is no clear evidence that Dr. Moore's involvement with Snell extended beyond Moore's writing one letter to the Appeals Council on May 13, 1996. Accordingly, we will take Snell to have had only two treating physicians, namely Cooley and Clark.

Snell argues that the opinions of those two physicians should be controlling. We cannot agree. The record contains evidence from several other doctors who examined Snell and made less favorable findings. The opinions of Snell's treating physicians are therefore "inconsistent with the other substantial evidence," 20 C.F.R. § 404.1527(d)(2), and hence not entitled to controlling weight. The Commissioner did not err in regarding the opinions of Cooley and Clark as less than dispositive.

**B) Giving reasons and weighing evidence**

■ Our conclusion is different with regard to the question of whether the Commissioner adequately explained to Snell why the diagnoses of Drs. Cooley and Clark were not afforded controlling weight. Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998). Snell contends that the Appeals Council completely ignored the reports of Drs. Cooley and Moore, and also discounted Dr. Clark's opinion, without explaining why. We have already stated that Dr. Moore need not be considered among the treating physicians, but the Appeals Council did have an obligation to explain the weight it gave to the opinions of the other two doctors. We examine each in turn.

■ (1) *Dr. Cooley.* Dr. Cooley's name does not appear in the Appeals Council's decision, but that decision does make reference to a few of his reports, citing them by exhibit number. Significantly, the Appeals Council accepted Cooley's reported findings and disagreed only with his ultimate conclusion that Snell was totally disabled.[3] The final question of disability is,

---

**3.** Total disability was the conclusion only of Cooley's August 6, 1993 report. **A186.** His findings on other dates suggested that Snell might eventually return to work, **(A196, A229)** and even the August 6, 1993 assessment held out the "guarded" possibility that Snell would, with proper conditioning, be able to work in the future. **(A186).**

as noted earlier, expressly reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1).

Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation, under *Schaal* and § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited. The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable. A claimant like Snell, who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *See* Jerry L. Mashaw, Due Process in the Administrative State 175–76 (1985). Snell is not entitled to have Dr. Cooley's opinion on the ultimate question of disability be treated as controlling, but she is entitled to be told why the Commissioner has decided—as under appropriate circumstances is his right—to disagree with Dr. Cooley. We therefore remand this case to the Appeals Council for a statement of the reasons on the basis of which Dr. Cooley's finding of disability was rejected.

(2) *Dr. Clark.* In its decision denying benefits, the Appeals Council stated correctly that Dr. Clark had made contradictory findings in different examinations conducted on February 16, 1995 and March 9, 1995. The March 9 findings were more favorable to Snell, but the Appeals Council chose to credit the February 16 report. By way of explaining that decision, the Appeals Council noted that the February 16 examination was the more detailed of the two.

The Council made no reference, however, to Clark's third examination, which was conducted on August 3, 1995. The findings on that date were even more favorable to Snell than were the March 9 findings. The Appeals Council's explanation of why it trusted the February 16 report rather than that of March 9 was adequate as far as it went, but the Council did not explain why the findings of February 16 should be preferred to those of August 3. It may be that there are reasons for discrediting the August report. But it is equally possible that the Council's failure to give weight to those findings was inadvertent. In any event, on the record before us, it is clear that the Appeals Council has not given a reason for discrediting the most pro-claimant findings of Dr. Clark, who was a treating physician.

On this appeal, the Commissioner argues that there was no need to consider Clark's findings at all. Clark's exams were conducted more than a year after Snell's coverage lapsed, and Clark never related her findings back to the period of coverage. That might, perhaps, have been an acceptable reason for a decision by the Commissioner not to give much weight to Clark's findings. But the Appeals Council did not in fact offer that reason. And it is more than doubtful that such a rationale could have underlain the Appeals Council's choice to ignore the August 3 report, because that body's statement about the relative merits of the February 16 and March 9 examinations—which were likewise conducted after coverage lapsed—indicates that Clark's examinations were not simply dismissed as untimely.

■ A reviewing court "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). We therefore conclude that Snell is entitled to an express recognition from the Appeals Council of the existence of Dr. Clark's favorable August report and, if the Council does not credit the findings of that report, to an explanation of why it does not.

## C) Subjective pain

■ Snell also argues that the Commissioner erred by not giving proper consideration to her subjective reports of pain. Under appropriate circumstances, the subjective experience of pain can support a finding of disability. *See Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir.1983). A claimant who alleges a disability based on the subjective experience of pain need not adduce direct medical evidence confirming the extent of the pain, but the applicable regulations do require "medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain." 20 C.F.R. § 404.1529(a). *See also* 42 U.S.C. § 423(d)(5)(A) (stating that a claimant's report of pain will not be sufficient to establish disability in the absence of medical findings of an impairment that could reasonably be expected to produce the pain alleged).

■ The record is replete with evidence that Snell claims to experience severe and ongoing pain, even though various medical examinations have failed to discover a medical explanation for that pain. Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings. *See Donato v. Secretary of HHS,* 721 F.2d 414, 418–19 (2d Cir.1983). The ALJ found Snell's allegations of pain to be credible, at least in part. The Commissioner is not bound by the ALJ's finding as to Snell's credibility on the issue of pain, but if the Commissioner disregards the finding, he should explain why he is doing so. After all, the ALJ is in a better position to decide issues of credibility. *See Kirkland v. Railroad Retirement Bd.,* 706 F.2d 99, 103–104 (2d Cir.1983).

Snell claims that the Appeals Council erroneously reversed the ALJ's finding of credibility and that it gave no explanation for that reversal. But in fact, the Appeals Council did explain the reason for its decision not to find Snell disabled based on her subjective reports of pain. In its decision, the Council wrote that it had "considered the claimant's subjective complaints of pain ... [but] the record does not contain medical signs and laboratory findings of an impairment which could reasonably be expected to produce her symptoms." Under § 404.1529(a), the absence of such findings precludes a determination of disability grounded on subjective pain.

## D) Mental impairments

■ Relying chiefly on the report of Dr. Freeling, the ALJ found Snell to be disabled by reason of mental impairment. The Appeals Council reversed the ALJ's decision on this issue. Snell claims that the Council erred by not considering evidence of mental impairment from the time after coverage lapsed, which it is required to do because such evidence may indicate mental impairment at an earlier time.

Snell mischaracterizes the decision of the Appeals Council. Its written opinion did consider evidence of mental impairments from the time after coverage lapsed, specifically including Dr. Freeling's examination and diagnoses. The Appeals Council found, however, that even if Snell had a mental impairment at the time of Freeling's exam, no such impairment existed when SSDI coverage lapsed on December 31, 1993. It seems that the Appeals Council, after weighing the post-coverage evidence of Snell's mental condition, was simply not persuaded by that evidence that Snell suffered from an impairment before her coverage lapsed.

The Appeals Council said that even if the mental impairments that might have been present as of Dr. Freeling's exam had existed earlier, and specifically in 1993 when Snell was still covered by SSDI, "there is no indication that the claimant's mental impairment resulted in limitations in her daily activities" at that time. This point is critical. It is clearly the case that Snell was able to work until the time of her accident, which occurred on July 3,

1991. Thus, any mental disabilities that she might have had—including the problems that Freeling diagnosed and the depression that other examining physicians suggested—did not prevent Snell from working before that date. Accordingly, for Snell's mental impairments to render her disabled after the accident but before the end of her coverage period (*i.e.*, between July 1991 and December 1993), it would have to be the case that, during that time, her mental condition deteriorated from what it had been when she was in fact working.

Dr. Freeling explicitly stated that there was "no indication of any significant ... deterioration from a previously higher level of functioning." Clearly, if Snell's mental condition never deteriorated from what it was while she was working, she cannot claim to have become disabled by reason of mental impairment. But it is difficult to reconcile this notation about deterioration and Dr. Freeling's finding that, when he examined Snell in 1995, she had little or no ability to exercise judgment or interact with supervisors with the acknowledged fact that Snell held several jobs before 1991. One of these three propositions must bend.

Under the circumstances, we are left in doubt as to the extent to which Dr. Freeling actively attempted to identify the onset date of Snell's mental disabilities. His report is, after all, consistent with his not having pursued the question very far: he describes only an *absence of findings* on this question. In contrast, his conclusion about Snell's judgment and probable interactions with supervisors was an affirmative determination, and Snell's having held jobs prior to 1991 is established beyond peradventure. The statement about deterioration thus seems the weakest of the three.

If there are no adequate findings as to the onset date of Snell's mental impairments, then it is not clear how the Appeals Council determined that any mental disability from which Snell currently suffers could not have commenced prior to the lapse of her SSDI coverage. In view of the contradictory conclusions, the Commissioner should, on remand, ensure that an affirmative exploration of when Snell's mental disabilities began is carried out.

Finally, even if the evidence in the record is sufficient to permit the Appeals Council to conclude that Snell's mental condition is not independently disabling, the possibility remains that Snell became disabled because of a combination of physical and mental difficulties. The record contains no findings about the possibility of such a combined impairment. On remand, the Commissioner should develop the record sufficiently to permit determinations as to whether Snell suffers from a combined disability and whether the onset date of such a disability, if any, occurred during the time of her SSDI coverage.

## CONCLUSION

The judgment of the district court is vacated, and the case is remanded to the Appeals Council for further proceedings consistent with this opinion.