**Ivan JOSEPH, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. 02 CV 5719 ADS ETB.**

United States District Court,
E.D. New York.

Feb. 12, 2004.

Fusco, Brandenstein & Rada, P.C. by John Antonowicz, Esq., Woodbury, NY, for Plaintiff.

Roslynn R. Mauskopf, United States Attorney, Eastern District of New York by Richard T. Lunger, Assistant United States Attorney, Central Islip, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Ivan Joseph ("Joseph" or the "plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security (the "Commissioner") denying disability insurance benefits to him. Both parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

## I. BACKGROUND

### A. The Procedural History

On March 24, 1999, Joseph filed an application for social security disability insurance benefits, claiming disability since September 26, 1997 due to constant back pain. After his application initially and on reconsideration was denied, he requested a hearing before an administrative law judge ("ALJ"). On November 1, 2000, a hearing was conducted in Miami, Florida where the plaintiff was represented by an attorney. In a decision dated May 16, 2001, the ALJ found that Joseph was not disabled within the meaning of the Act and was therefore not entitled to disability insurance. On May 16, 2001, he filed a request for review with the Appeals Council. On September 27, 2002, the Appeals Counsel declined to review the claim, making the ALJ's decision the final administrative determination. This appeal followed.

### 1. Joseph's Testimony at the Hearing

At the November 1, 2000 hearing, the plaintiff stated that he was born on April 13, 1964, making him 36 years of age at the time of the administrative hearing. Joseph graduated from high school. At the time of the hearing, he lived in Grenada. Before moving to Grenada, he worked at a Pathmark supermarket in New York on and off for 17 years and was an assistant produce manager. His duties included unloading, delivering, and breaking down produce in the supermarket. Joseph's position also included customer relations duties and occasionally supervising seven employees in the produce department.

Joseph testified that, on March 20, 1996, he injured his middle to lower back while he was unloading heavy cartons. As a result, Joseph stated that he had difficulty reaching, bending, lifting, and sleeping. The plaintiff stated that he continued to work on and off until September 1997. Although Norflex, a muscle relaxer, was previously prescribed for him on a date not specified in the transcript, the plaintiff testified that he was not currently taking any medication. He stated that he was seeing an orthopedist, Dr. Kester Dragon, about every six weeks. Prior to seeing Dr. Dragon, Joseph testified that he was seeing Dr. Salvatore Inserra.

Joseph also testified that for the entire day he could sit for a total of three hours, stand for a total of three hours, and walk about five miles or for about 15 minutes. However, he explained that he felt pain after sitting for about 45 minutes or standing for about 40 minutes. He also testified that he had trouble sleeping at night and that he had problems bathing and dressing. Joseph testified that he did some light cooking and that he attended church for approximately 45 minutes to an hour every other Sunday. The plaintiff stated that he played the drums but had not played in a year and a half. The plaintiff further stated that he spent his days lying down, watching television, reading, and taking short walks and drives.

Furthermore, Joseph reported that he had been depressed for about 6 to 9 months and was experiencing recurrent crying spells and suicidal thoughts, but had not received any medical treatment for his depression.

### 2. The Treating Physicians

### a. Dr. Salvatore Inserra

Between December 3, 1997 until May 21, 1999, Dr. Salvatore Inserra, an orthopedic surgeon, treated the plaintiff. During each of the examinations, Joseph complained of recurrent pain and stiffness in his lower back which interfered with his sleeping habits. On January 2, 1998, Dr. Inserra noted that Joseph was able to ambulate with a normal gait pattern and that "range of motion of the lumbosacral spine was painful, but normal." He observed that the plaintiff's deep tendon reflex and his motor and sensory exam were intact. In addition, based on a December 3, 1997 x-ray of the lumbosacral spine and pelvis, he stated that there was evidence of degenerative disc disease at L4–L5 and L5–S1.

On March 29, 1998, the plaintiff complained of "residual pain in his lower back, associated with recurrent spasm, stiffness and generalized discomfort, aggravated by prolonged standing and physical activity." Dr. Inserra diagnosed the plaintiff as suffering from chronic discogenic type pain syndrome of the lumbosacral spine; osteoarthritis; spondylolysis at L–5; and herniated disc disease at L5–S1. Dr. Inserra requested authorization for epidural steroid injections and recommended exercise at home. In an evaluation conducted on June 26, 1998, Dr. Inserra recommended epidural steroid injections to the lumbosacral spine and physical therapy three times a week for six weeks.

Dr. Inserra continued to treat the plaintiff at about six week intervals until May 21, 1999. Examinations showed diffuse tenderness in the lower back; range of motion was limited about 10 percent with stiffness and pain; and flexion was possible to 50 degrees and lateral flexion was possible to 10 degrees. Dr. Inserra repeatedly assessed degenerative disc disease in the lumbosacral spine with bulging discs at L4–L5 and L5–S1, chronic myofascial spasm and pain syndrome. Each examination revealed that straight leg raising, deep tendon reflexes, and motor and sensory examination were normal. Dr. Inserra noted that Joseph denied any dysesthesia or radiation of pain to the lower extremities. Dr. Inserra continued to request authorization for epidural steroid injections and to recommend home exercises. In workers compensation forms he completed, Dr. Inserra indicated that Joseph was disabled from any type of work.

### b. Dr. Kester Dragon

On July 10, 1999, Dr. Kester Dragon, an orthopedic surgeon in Grenada, began treating the plaintiff. His notes indicate a total of five visits with Joseph from July

10, 1999 through October 2000. At that time, the plaintiff complained of back pain that disturbed his sleep. An examination revealed that his lower back had spasm and tenderness. In undated notes, Dr. Dragon reported that the plaintiff's sensation and reflexes were intact and that his spinal motion was reduced. Dr. Dragon ordered x-rays and prescribed Norflex and physical therapy. At the next visit, he reported that the plaintiff again complained of pain. Dr. Dragon noted that there was less spasm. He also recommended that the plaintiff start physical therapy.

In or about October 1999, Dr. Dragon noted that the plaintiff had shown some improvement with therapy. On June 3, 2000, Dr. Dragon reviewed x-rays which revealed degenerative changes at L5–S1. In August 2000, Dr. Dragon completed a Medical Assessment of Ability to do Work Related Activities form, indicating that, due to the spasm in his lower back, the plaintiff could lift or carry 15 pounds occasionally or 4 pounds frequently. According to Dr. Dragon, Joseph could stand and/or walk a total of 3 hours and sit for a total of 3 hours in an eight-hour workday. Dr. Dragon stated that the plaintiff could stand and/or walk one hour without interruption and sit one hour without interruption. He further opined that Joseph could occasionally climb, crouch, crawl and stoop and frequently kneel and balance during an eight-hour workday. Dr. Dragon added that he would need to lie down during the day due to fatigue.

On October 20, 2000, Dr. Dragon reported that the plaintiff continued to complain of lower back pain, with cramps down both legs. An examination revealed that Joseph's gait was normal, but that "spinal flexion and extension were significantly limited by pain." Dr. Dragon observed that the plaintiff's reflexes and sensation were intact. He recommended that the plaintiff avoid frequent and prolonged bending and lifting. Dr. Dragon opined that constant standing and sitting would aggravate symptoms. Dr. Dragon further opined that the plaintiff would not be able to continue his job as a storeroom manager.

### 3. The Consulting Physicians

### a. Dr. S. Gowd

In a report dated June 12, 1999, Dr. S. Gowd, an internist who is a state agency review physician, evaluated the plaintiff's residual functional capacity. Dr. Gowd indicated that the plaintiff could lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, and stand and/or walk and sit for about six hours each in an eight-hour workday. He also noted that the plaintiff's ability to push and pull was unlimited. In addition, Dr. Gowd reported that Joseph could occasionally climb stairs, stoop, kneel, crouch and crawl.

### b. Dr. Samir Dutta

On June 28, 1999, Dr. Samir Dutta, a general surgeon, examined Joseph at the request of the New York State Department of Social Services Office of Disability Determination. The plaintiff complained of lower back pain and weakness in his left leg. Joseph disclosed that he was seeing a chiropractor twice a week. He also reported that he could drive, take care of his own personal needs, and do light household chores. The plaintiff also reported that he could sit for two hours, stand for one and one-half hours, walk one and one-half miles, and carry 15 to 20 pounds.

Upon examination, Dr. Dutta observed that the plaintiff walked with a normal gait and was "well developed, well nourished, not in apparent distress." Dr. Dutta observed that Joseph could stand and walk

on toes and heals and could squat. Dr. Dutta also noted that the plaintiff's neurological examination was normal and that x-rays of the lumbosacral spine showed disc space narrowing of L4–L5 and L5–S1. In addition, Dr. Dutta remarked that there was no evidence of fracture, dislocation, or destructive lesions. Dr. Dutta indicated that the plaintiff had a degenerative disc disease and spondylolysis of LS spine and opined that Joseph's conditions are "chronic in nature, and are unlikely to improve significantly." Based upon the findings of the examination, Dr. Dutta concluded that Joseph could sit three to four hours, stand two to three hours, walk two to three miles, and carry 30 pounds. Dr. Dutta did not indicate whether these limitations relate to Joseph's capacity to sit, stand, and walk over an eight-hour period or for individual periods of time.

### 4. The Diagnostic Tests

A February 19, 1997 magnetic resonance imaging test ("MRI") taken of the lumbar spine showed evidence of bulging disc at L4–L5 and L5–S1. There was no evidence of a herniated disc. The MRI also showed no evidence of spinal canal stenosis, intraspinal mass lesion, or spondylolisthesis. The MRI revealed active degenerative disc disease and bulging disc at L4–L5, as well as spondylolysis.

A July 18, 1996 x-ray showed evidence of a "spondylolysis of the pars interarticularis at L5." There was no definite spondylolisthesis. The x-ray also showed evidence of degenerative narrowing of L4–L5 disc. The posterior elements were intact. As noted above, a December 3, 1997 x-ray also showed evidence of degenerative disc disease of the lumbosacral spine at L4–5 and L5–S1 with degenerative spondylolysis. A June 28, 1999 x-ray performed at the request of the State Agency showed disc space narrowing at L4–5 and L5–S1.

### 5. The Testimony of Dr. Bernard Gran

Dr. Bernard Gran, a neurologist, testified in the capacity of a medical expert for the Commissioner at the November 1, 2000 hearing. Dr. Gran testified that he had never examined or talked to Joseph but that he had reviewed Joseph's medical records and listened to his testimony. Dr. Gran noted that no herniation or compression of neurological structures was observed in the February 1997 MRI. According to Dr. Gran, the plaintiff's medical impairments were bulging discs at L4–5 and L5–S1, spondylolysis at L5 and degenerative disc disease. Dr. Gran explained that, although a bulging disc can cause some discomfort, it would not be the cause for the continuous daily pain reported by the plaintiff. In addition, Dr. Gran testified that the MRI showed degenerative disc disease. Dr. Gran explained that degenerative disc disease means that the gelatinous material within the disc loses some of its water content. As a result, the space between the two vertebrates narrows. Dr. Gran asserted that degenerative disc disease usually does not cause pain unless the patient develops reactive arthritis and herniation of the disc.

Dr. Gran also noted that examinations revealed that the plaintiff was limited in his movement and experienced spasms, but that he had normal motor reflexes and sensory findings. Based on the medical evidence and Joseph's testimony, Dr. Gran opined that Joseph could sit for two hours at a time for a total of six hours in an eight hour workday, walk for one hour at a time for a total of three hours in an eight hour day, stand for one hour at a time for a total of three hours in an eight hour workday, lift 15 to 20 pounds occasionally, and lift 10 pounds frequently. In addition, Dr. Gran assessed that the plaintiff could stoop

and kneel occasionally, but not climb ropes, ladders or scaffolding, crouch or crawl. He reported that the plaintiff had no restrictions in reaching.

Dr. Gran further noted that there was no reference to depression or depression-like symptoms in any of Joseph's medical documents. Dr. Gran testified that there was nothing in the record that would limit Joseph's functional capacity as a result of his non-exertional, mental restrictions.

### 6. The Testimony of Gary Fannin

Gary Fannin, a vocation expert, also testified at the November 1, 2000 hearing. Fannin classified the plaintiff's job as an assistant produce manager as a semi-skilled level job and in the heavy physical demand category. Fannin stated that the plaintiff could not work at the exertional level at the heavy level. Based on Joseph's age, education, prior work experience, and physical limitations, Fannin testified that the plaintiff could perform a full range of sedentary work with a sit/stand option. In particular, Fannin identified assembly jobs, which includes silver wrapper, plastic assembler, product assembler, folder, garnisher, and paster.

### B. The ALJ's Findings

The ALJ denied Joseph's disability claim. Based on the medical evidence and Joseph's subjective complaints, the ALJ concluded that he could sit six hours (two hours at one time), walk three hours (one hour at one time), and stand three hours (one hour continuously) in an eight-hour workday. In addition, the ALJ determined that Joseph was capable of lifting, carrying, pushing, or pulling 15 to 20 pounds occasionally and 10 pounds frequently. The ALJ also found that he had no nonexertional restrictions on functions such as reaching, handling, seeing, hearing and speaking.

The ALJ stated that spasm was evident on examination and greater limitations in spinal motion were noticed on isolated examination. The ALJ found that MRI of the plaintiff's cervical spine demonstrated some degenerative changes in the lumbo-sacral spine. In addition, the ALJ found that there was no evidence of a herniated disc or other spinal condition that impinged on any neurological structures. The ALJ also noted that none of the examining doctors found any radicular signs. In addition, the ALJ stated that Dr. Inserra consistently found that Joseph's motor function, sensation, and reflexes were intact. The ALJ noted that Dr. Dragon's neurological examinations also showed intact sensation and reflexes and that Dr. Dutta found no sensory or motor deficits in the lower extremities.

Although Dr. Inserra's opinion was considered, the ALJ ultimately concluded that Dr. Inserra's opinion that the plaintiff was totally disabled was inconsistent with the doctor's limited medical findings. The ALJ also rejected Dr. Dragon's assessment that the plaintiff needed to lie down during the day because of fatigue. The ALJ pointed out that none of Dr. Dragon's progress notes specifically reference the plaintiff's complaints of fatigue. In addition, the ALJ pointed out that, although Dr. Dragon appeared to have seen the plaintiff five times since July 1999, the doctor did not actually examine him on at least two of these occasions. The ALJ pointed out that the progress notes contained few objective findings and that they were mainly derived from Dr. Dragon's initial examination in July 1999 and the last examination in October 2000. The ALJ found that, despite Dr. Dragon's concerns, Dr. Gran and Dr. Dutta's assessment were remarkably similar in that they indicated the Joseph could perform a full range of light work.

The ALJ gave the most weight to Dr. Gran's opinion. The ALJ noted Dr. Gran's opinion was consistent with Dr. Dutta and Dr. Gowd's opinion that Joseph could lift or carry 15 to 20 pounds occasionally or 10 pounds frequently. The ALJ pointed to the plaintiff's own assertion to Dr. Dutta in June 1999 that he could carry 15 to 20 pounds. The ALJ found no medical basis for the limitations imposed by Dr. Dragon on reaching and on the need to lie down during the day. As such, the ALJ gave no weight to those aspects of Dr. Dragon's opinion.

Furthermore, the ALJ concluded that Joseph's assertions regarding his depression with suicidal ideation were not credible. The ALJ pointed out that none of the examining physicians reported any complaints of depression and that no mental status abnormalities were noted at any time. The ALJ opined that Joseph's testimony that he experienced depression was entirely unsupported which raised concerns about Joseph's credibility in other respects. In particular, the ALJ determined that Joseph overstated the extent of recent treatments. Although Joseph asserted that he saw Dr. Dragon every six weeks, the ALJ pointed out that, based on Dr. Dragon's notes, it appeared that the doctor saw him only five times from July 1999 through October 2000 and did not appear to have examined him on at least two visits. In addition, the ALJ found that Dr. Dragon repeatedly suggested therapy but that there was no confirmation that Joseph received any physical therapy. The ALJ also stated that Joseph admitted at the hearing that he no longer used any prescriptive medications for pain.

In addition, the ALJ noted that the plaintiff admitted that he could sit three hours (45 minutes at a time), stand three hours (40 minutes continuously), walk 15 to 20 minutes and lift or carry 15 to 20 pounds. The ALJ found that these assertions were close to those reports by Dr. Gran and belied the assertions of total disability. Furthermore, the ALJ stated that, although the plaintiff denied doing any housework at the hearing, he told Dr. Dutta in June 1999 that he did light household chores and admitted that he cooked and cleaned. Because the plaintiff acknowledged at the hearing that he spent time socializing, reading and watching television, the ALJ concluded that his activities overall were not significantly limited.

## II. DISCUSSION

### A. Standard of Review

■ To review the Commissioner's decision, the Court must determine whether (1) the Commissioner applied the correct legal standard, *see Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); and (2) the decision is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Brown v. Apfel,* 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Rather, substantial evidence requires enough evidence that a reasonable person "might accept as adequate to support a conclusion." *Brown,* 174 F.3d at 62–63.

■ In determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting interferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam)). In addition, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting

evidence in the record." *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, " 'the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review.' " *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

## B. Analytical Framework

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). To qualify for disability benefits under the Act, the plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

▇▇▇ The federal regulations set forth a five-step analysis that the Commissioner must follow in evaluating disability claims:

1. The ALJ must consider whether the claimant is currently engaged in substantial gainful activity.

2. If not, the ALJ must consider whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the ALJ must ask whether, based solely on medical evidence, that limitation is listed in Appendix 1 of the regulations.

4. If the impairment is not "listed" in the regulations, the ALJ then asks whether she has residual functional capacity to perform her past work despite her severe impairment.

5. If she is unable to perform her past work, the burden shifts to the ALJ to prove that the claimant retains the residual functional capacity to perform alternative work.

20 C.F.R. §§ 404.1520, 416.920; *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.2003) (citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002)). The claimant bears the burden of proof as to the first four steps, while the ALJ bears the burden of proof as to the fifth step. *See Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000). In proceeding through the five-step analysis, the Commissioner must consider four factors: "(1) objective medical facts, (2) diagnosis or medical opinions based on these facts; (3) subjective evidence of pain and disability; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir.1983).

## C. Analysis

In the first step, the ALJ determined that Joseph had "not engaged in substantial gainful activity since September 26, 1997, his alleged onset date of disability." At steps two and three, the ALJ concluded that, although the plaintiff's "back condition is severe," his impairment did not meet or equal the specifications of severity of any impairment in Appendix I. In step four, the ALJ found that the plaintiff did not retain the functional capacity to perform his past relevant work as an assistant produce manager. At the fifth step, however, the ALJ determined that the plaintiff

was not disabled, as he could perform other work.

The plaintiff concurs with the ALJ's findings at steps one through four, but disagrees with his findings at step five. In particular, Joseph contends that the ALJ misapplied the treating physician rule by failing to accord appropriate weight to his treating physicians and argues that the ALJ misconstrued the record when assessing Joseph's credibility. The Court agrees.

### 1. The Treating Physician Rule

 Where the treating physician's opinion is supported by medically acceptable techniques, results from frequent examinations, and the administrative record, the ALJ is required to accord special evidentiary weight to the opinion of the treating physician. *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 119 (2d Cir. 1998). However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999). When controlling weight is not given to a treating physician's medical opinion, the ALJ must consider (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell*, 177 F.3d at 133 (2d Cir.1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998)).

 Here, Dr. Inserra's conclusion that the plaintiff was totally disabled was not determinative, as the ultimate issue of disability is reserved for the ALJ. *See* 20 C.F.R. §§ 404.1527(e), 416.27(e); *Snell*, 177 F.3d at 133 ("[S]ome kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are 'reserved to the Commissioner' ") (citing 20 C.F.R. § 404.1527(e)(1)); *see also Murphy v. Barnhart*, No. 00 Civ. 9621, 2003 WL 470572, at *7, 2003 U.S. Dist. LEXIS 6988, at *7 (S.D.N.Y. Jan. 21, 2003) ("The ALJ is not required to give controlling weight to a treating physician's opinions as to the ultimate issue of whether the claimant meets the statutory definition of disability."). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability." *Snell*, 177 F.3d at 133.

However, the ALJ failed to give proper deference to the findings by the plaintiff's treating physicians, Dr. Inserra and Dr. Dragon. The ALJ stated that he accorded little weight to Dr. Inserra's findings because such findings were "limited" and "not consistent with the conclusion offered." This is the only reference in the ALJ's decision as to why he rejected Dr. Inserra's findings and conclusions. After multiple examinations, Dr. Inserra consistently reported that there was evidence of spasm and tenderness at the lower back area. Based on x-rays of the lumbosacral spine and pelvis, Dr. Inserra assessed degenerative disc disease, spondylolysis lumbosacral spine with chronic discongenic pain syndrome and myofascial spasm. There is no doubt that Dr. Inserra diagnosed Joseph with degenerative disc disease in the lumbosacral spine with bulging discs at L4–L5 and L5–S1. The ALJ failed to indicate the weight, if any, that he accorded to these aspects of Dr. Inserra's opinion. *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993) (holding that ALJ is

required to articulate the weight that is given to treating doctors' conclusions),

Dr. Dragon also found that the plaintiff had spasm and tenderness in his lower back. Dr. Dragon's x-rays revealed degenerative changes as L5–S1. He also stated on October 20, 2000 that the plaintiff's "spinal flexion and extension were significantly limited by pain." He recommended that Joseph avoid frequent and prolonged bending and lifting and opined that constant standing and sitting would aggravate the plaintiff's pain. In addition, Dr. Dragon reported that Joseph could stand and/or walk a total of 3 hours and sit for a total of 3 hours in an eight-hour workday and that the plaintiff could stand and/or walk one hour without interruption and sit one hour without interruption. Dr. Dragon concluded that Joseph would not be able to continue his job.

The ALJ determined that Dr. Dragon appeared to have seen the plaintiff five times between July 1999 and October 2000 and did not actually appear to have examined him on at least two of those occasions. The ALJ stated that Dr. Dragon's progress notes contained "few objective findings." However, the ALJ failed to explain his reluctance to accept Dr. Dragon's opinion that the plaintiff should avoid frequent and prolonged bending and lifting and that constant standing and sitting would aggravate the plaintiff's symptoms. The ALJ also discounted Dr. Dragon's opinion that Joseph could only sit and walk/stand for three hours each in an eight-hour workday.

In addition, the ALJ did not consider Dr. Inserra and Dr. Dragon's assessment of spondylolysis and bulging discs which were also revealed in the x-rays and MRI. The ALJ failed to set forth any reasons for not crediting these findings. Nor did the ALJ adequately explain why the State agency doctors' reports were more credible than those of the plaintiff's treating physicians. The treating physicians' opinions were entitled to substantial weight, and the failure of the ALJ to give "good reasons" for failing to give those opinions any weight constituted legal error. *See, e.g., Ferraris v. Heckler,* 728 F.2d 582, 586–87 (2d Cir.1984) (case remanded because ALJ failed to consider treating physician's opinion as to claimant's ability to sit for more than one or two hours at a time).

In the Court's view, the ALJ's errors cannot be overlooked as harmless. The ALJ specifically found that the plaintiff was able to perform a reduced range of light or sedentary work. "Sedentary work is defined as involving only occasional standing or walking, the lifting of no more than ten pounds at a time, and the occasional lifting and carrying of light objects." *Schaal v. Apfel,* 134 F.3d 496, 501 n. 6 (1998). "Sedentary work also generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday." *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). The ALJ concluded that Joseph could sit six hours (two hours at one time), walk three hours (one hour at one time), and stand three hours (one hour continuously) in an eight-hour workday. If the ALJ had considered the treating physicians' opinion, he might have found that Joseph did not retain the capacity to perform sedentary work under these standards. Thus, the ALJ's failure to credit the findings set forth above is cause for remand. *See Snell,* 177 F.3d at 133 ("Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand").

Moreover, "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from the treating physician[s] sua sponte." *Schaal,* 134 F.3d at 505; *see also Rosa v.*

*Callahan,* 168 F.3d 72, 82–83 (2d Cir.1999) ("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Commissioner for further development of the evidence."). Because the ALJ may not rely on the absence of evidence, he is under an affirmative duty to fill in any gaps in the record. *Schaal,* 134 F.3d at 505.

Here, in light of the well-established treating physician rule and given the findings of disability by Dr. Inserra and Dr. Dragon, the ALJ should have sought additional information to clarify the treating source evidence and opinions. Before rejecting the treating physicians' opinions, the ALJ should have filled any clear gaps in the record. *See Perez,* 77 F.3d at 47 ("The ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even the claimant is represented by counsel."). Accordingly, the decision of the Commissioner is vacated, and the case is remanded for further administrative proceedings.

### 2. The ALJ's Assessment of Joseph's Credibility

Because the Court remands this case for the reasons described above, and because Joseph's credibility may be impacted by additional medical evidence, the Court sees no reason to address the ALJ's credibility analysis.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Commissioner's motion for judgment on the pleadings is **DENIED;** and it is further

**ORDERED,** that Joseph's motion for judgment on the pleadings is GRANTED; and it is further

**ORDERED,** that the final decision of the Commissioner is vacated and this case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further administrative proceedings in accordance with this Order; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**