Martin A. HILL, Plaintiff,

v.

Jo Anne BARNHART, Commissioner of Social Security, Defendant.

No. 04 Civ. 2712(PAC).

United States District Court, S.D. New York.

Jan. 18, 2006.

Charles E. Binder, Bunder & Binder, P.C., New York, NY, for Plaintiff.

Susan D. Baird, U.S. Attorney's Office, SDNY, New York, NY, for Defendant.

## DECISION AND ORDER

CROTTY, District Judge.

Plaintiff, Martin Hill, brings this action to review a decision of the Commissioner of Social Security (the "Commissioner"), which denied his application for disability insurance benefits under the Social Security Act (the "Act"). The Commissioner moved and Hill cross-moved for judgment on the pleadings. This Court has jurisdiction over this action under 42 U.S.C. § 405(g). The question before the Court is whether substantial evidence supports the Commissioner's decision that Hill was not disabled between May 15, 1996 and December 31, 2001, the last date plaintiff was insured for disability insurance benefits. The Court finds that substantial evidence supports the Commissioner's denial of benefits and grants the Commissioner's motion for judgment on the pleadings.

## BACKGROUND

### I. Procedural History / Administrative Proceedings

Plaintiff filed an application for disability insurance on November 5, 1996 in which he alleged that he became disabled on May 15, 1996 (Tr. at 114–17). The Social Security Administration ("SSA") denied his application initially on February 14, 1997 (Tr. at 56–58) and on reconsideration on March 13, 1997 (Tr. at 60–62). Hill requested a hearing on March 11, 1998 (Tr. at 63–66) and a hearing was held before Administrative Law Judge ("ALJ") Robin J. Arzt on July 7, 1998 (Tr. at 663–97). Hill was represented at that hearing. ALJ Arzt issued a decision on September 14, 1998 finding that Hill was not entitled to disability insurance benefits at any time since May 15, 1996 through the date of the decision (Tr. at 45–55). Hill requested a review of the hearing decision by the Appeals Council on September 29, 1998. On July 10, 2001, the Appeals Council remanded the claim back to ALJ Arzt for further proceedings (Tr. at 95–98). The Appeals Council found that ALJ Arzt's decision did not adequately evaluate the opinion by Hill's treating physician, Richard Memoli M.D., that ALJ Arzt had not contacted Dr. Memoli to clarify any inconsistencies pursuant to 20 C.F.R. § 404.1512, and that further consideration was warranted of new evidence that Hill had submitted to the Appeals Council (Tr. at 96). A second hearing was held before ALJ Arzt on June 12, 2002, at which hearing Hill once again appeared with counsel (Tr. at 698–731). On January 30, 2003, ALJ Arzt found Hill not disabled through December 31, 2001,

the date he was last insured for disability insurance benefits (Tr. at 13–29). Hill requested a review of the January 30, 2003 decision by the Appeals Council (Tr. at 10–12). On February 11, 2004, the Appeals Council denied Hill's request for review and ALJ Arzt's decision became the final decision of the Commissioner (Tr. at 4–6). Hill commenced the instant action on April 9, 2004.

## II. Statement of Facts

### A. Claimant's Testimony and Non–Medical Evidence

Hill was born on March 22, 1965 (Tr. at 672) and was 31 years old at the time he claimed he became disabled on May 15, 1996. Hill had a high school education (Tr. at 675) and had worked as a car mechanic for ten years (Tr. at 166) and, prior to this employment, as a cashier, stock clerk, and security guard for two-and-a-half years (Tr. at 166, 681). These jobs required heavy physical exertion (Tr. at 681–82). In October, 1994, Hill injured his left ankle and was out of work for a couple of months (Tr. at 678–79). Hill returned to work (Tr. at 679) and, on March 8, 1995, Hill slipped on some oil and injured his left knee resulting in an "internal derangement" (Tr. at 239, 677). Hill worked "light duty" until May 15, 1996 (Tr. at 152, 678) when he stopped working.

### 1. Hill's Testimony at the July 7, 1998 Hearing

Hill testified that he had seen Dr. Memoli since 1994 and that he had last seen Dr. Memoli on June 4, 1998 (Tr. at 667). Hill had surgery on his left knee in October 1996 (Tr. at 670). Hill testified that he had been approved for further surgery but that no laboratory tests had been conducted prior to that approval (Tr. at 668). Hill further testified that he had trouble climbing flights of stairs, no longer drove a car, and had someone accompany him wherever he went (Tr. at 673). Hill noted that "[i]f I sit too long I can't stand and if I stand too long my leg gets excruciating pain" (Tr. at 673). Hill testified that after the October 1996 surgery the knee starting "popping out of place" (Tr. at 682) and that he wore a brace to keep the knee from "buckling and locking up" (Tr. at 687). Hill testified that he took pain and anti-swelling medication (Tr. at 688). Hill also testified that he could only sit or stand for fifteen to twenty minutes at a time (Tr. at 690) and had fallen because of the buckling of the knee (Tr. at 693). Hill stated that he had pain in his ankle every day and that he had "constant, constant pain" in his left knee (Tr. at 689). Finally, Hill testified that he usually spent most of the day in bed with his legs elevated (Tr. at 694) and that he cried from the pain every day (Tr. at 695).

### 2. Hill's Testimony at the June 12, 2002 Hearing

On remand from the Appeals Council, Hill testified at a second hearing before ALJ Arzt held on June 12, 2002. Hill stated he that he had had surgery on the left knee in October 1996 and in February 17, 1999 and surgery on the left ankle in April 2000 (Tr. at 702). Hill testified that he had physical therapy from October 1996 until July or August 2000 but stopped due to problems with his right knee (Tr. at 706). Hill testified that he had not had an MRI or a CAT scan of his knee or ankle after his last surgery in 2000 nor of his left knee after his surgery in 1999 (Tr. at 709). Hill once again testified that he experienced pain in his left knee and that he could not "sit too long or … stand too long" (Tr. at 715). Hill noted that his left ankle was better than it had been in the past (Tr. at 716). Hill testified that he could walk for approximately half an hour before having to rest and that he could

stand and sit for up to fifteen to twenty minutes (Tr. at 718).

When Hill was examined by his attorney he testified that, following his stopping work in May 1996, he was bedridden and that his legs had to be elevated all the time to reduce the swelling and the pain (Tr. at 723, 727) and that this condition continued in this way for four years (Tr. at 724). Hill also testified that he took and continued to take pain medication (Tr. at 727–38).

## B. Medical Evidence

Hill complained of two accidents: the first occurred on October 12, 1994 and resulted in an injured left ankle; the second occurred on March 8, 1995 and resulted in an injured left knee. In total, Hill had three surgeries: an October 4, 1996 surgery on the left knee entailed an arthroscopic medial meniscectomy;[1] a February 17, 1999 surgery to the left knee involved an arthroscopic lateral meniscectomy and synovectomy; and, an April 5, 2000 surgery on the left ankle excised a calcified mass (Tr. at 244–45). Hill claimed disability insurance benefits beginning on May 15, 1996 through to December 31, 2001, his last date insured.

### 1. Regulatory Framework Regarding Medical Evidence

Implementing regulations carefully define and specify what constitutes medical evidence and how it is to be factored by the Agency in making disability determinations. For example, a treating source is defined as a claimant's "own physician . . . or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502; see also id. (defining "nontreating source" as a physician who examines the claimant but does not have an ongoing treatment relationship and a "nonexamining source" as a physician who has not examined the claimant but provides a medical or other opinion regarding the claimant's case). Claimants must submit evidence to demonstrate that they meet the statutory and regulatory definition of disability. § 404.1512(a). Such evidence includes, among other potential proof: medical evidence (i.e., medical signs and laboratory findings[2]), § 404.1512(b)(1); and, evidence from medical sources regarding medical history, opinions, and statements about treatment. § 404.1512(b)(2). Section 404.1527 contains a detailed explanation of how the Agency considers the evidence in making disability determinations. This provision provides that:

> If [the Agency] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evi-

1. Meniscectomy is defined as "[e]xcision of a meniscus, usually from the knee joint" and a "meniscus" is defined as "a crescent-shaped figrocartilaginous structure of the knee . . . joints." Steadman's Medical Dictionary 1019 (27th ed.2000).

2. The regulations define "medical findings" as "consist[ing] of symptoms, signs, and laboratory findings." 20 C.F.R. § 404.1528. "Symptoms are [the claimant's] own description

tion of [his] physical or mental impairment." § 404.1528(a). "Signs are anatomical, physiological, or psychological abnormalities which can be observed" and "must be shown by medically acceptable clinical diagnostic techniques." § 404.1528(b). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." § 404.1528(c).

dence in [the] case record, [the Agency] will give it controlling weight.

§ 404.1527(d)(2). If the treating source's opinion is not afforded controlling weight, the Agency considers factors (among others) such as the length of treatment, § 404.1527(d)(2)(i), the nature and extent of the treatment relationship, § 404.1527(d)(2)(ii), whether relevant evidence supports the treating source's opinion, § 404.1528(d)(3), and the degree to which that opinion is consistent with the record as a whole. § 404.1528(d)(4).

### 2. Treating Physicians

### Dr. Memoli

During the period of time at issue, May 15, 1996 through December 21, 2001, Hill's treating physicians included Dr. Memoli and Dr. Eial Faierman ("Faierman"), both orthopedic surgeons (Tr. at 83–88, 191). The medical records from the treating physicians include MRI reports, progress notes, operative reports, and post-surgery clinical notes.

**Medical Records Related to Hill's Left Ankle.** The bulk of the medical records from Dr. Memoli, Hill's principal treating physician, related to Hill's left ankle are reports submitted to the Workmen's Compensation Board comprised of an intake form (Tr. at 254), Attending Doctor's Report forms (Tr. at 255–59),[3] billing forms,[4] brief two– to four-sentence progress notes attached to the billing forms,[5] and requests for authorization for various types of ther-

---

**3.** The Attending Doctor's Reports are Workers' Compensation Board forms. Regarding Hill's left ankle, Dr. Memoli submitted similar forms on November 7, 1994 (Tr. at 255), November 21, 1994 (Tr. at 256), January 10, 1995 (Tr. at 257), April 17, 1995 (Tr. at 258), and June 21, 1995 (Tr. at 259). The last of these forms, dated June 21, 1995, indicates that Hill's left ankle was "improving" and that Hill experienced "only occasional pain and swelling" (Tr. at 259).

**4.** The billing forms related to Hill's left ankle began on October 19, 1995, (Tr. at 260,) and ended on April 1, 2002. They contained no elaboration but merely included the diagnosis of a "ligament sprain ankle lateral." Dr. Memoli submitted billing forms on January 3, 1995 (Tr. at 261), October 19, 1995 (Tr. at 260), February 14, 1996 (Tr. at 263), April 16, 1996 (Tr. at 266), June 20, 1996 (Tr. at 269), February 11, 1997 (Tr. at 272), May 20, 1997 (Tr. at 275), August 14, 1997 (Tr. at 278), November 24, 1997 (Tr. at 280), April 14, 1998 (Tr. at 282), October 2, 1998 (Tr. at 283), January 7, 1999 (Tr. at 284), April 18, 2000 (Tr. at 285), June 9, 2000 (Tr. at 286), July 24, 2000 (Tr. at 288), September 18, 2000 (Tr. at 290), January 19, 2001 (Tr. at 292), February 16, 2001 (Tr. at 294), May 18, 2001 (Tr. at 296), September 6, 2001 (Tr. at 298), November 12, 2001 (Tr. at 300), January 14, 2002 (Tr. at 302), April 1, 2002 (Tr. at 306).

**5.** Dr. Memoli's progress notes accompanying billing forms were typically comprised of two to four brief sentences. The progress notes began on April 6, 1996 and ended on April 1, 2002. Many of these progress notes stated that Hill's "condition remains unchanged," see e.g., Tr. at 265, 289, 291, 295, 301, that Hill had "persistent pain [with his] left ankle," see, e.g., Tr. at 265, 268, 271, 289 ("still pain"), 291, 295, 297 ("persistent intermittent pain"), 299 (same), 301 (same), 303 (same), 305 (same), or that Hill had "pain and swelling" (Tr. at 277, 287 (post surgery)). A progress note from May 20, 1997 indicated that an "MRI of the left ankle [was] negative however, still lateral ligament ankle pain and swelling" (Tr. at 274). Another progress note from July 24, 2000 following surgery to the left ankle stated that Hill "return[ed] ... with improvement, although still pain and swelling" (Tr. at 287). The final billing form related to Hill's ankle, dated April 1, 2002, stated that Hill's injury had resulted in a "moderate permanent partial disability" (Tr. at 306). Other than Hill's complaints of pain, there is barely any medical analysis or diagnosis. Eventually, Dr. Memoli stated that he "fe[lt,] based on workmen's compensation guidelines, [that] [Hill] has a schedule loss of use of his left foot of 15%" (Tr. at 303).

apies and tests.[6] Workmen's Compensation Board medical records related to Hill's 1994 left ankle began on November 7, 1994 and ended on January 14, 2002 and indicated as a diagnosis "ligament sprain lateral" (Tr. 255–321). The record also contains a report dated April 15, 1997 from Dr. Charles N. Barax who conducted an MRI of the left ankle. Dr. Barax's report indicated that the MRI was negative (Tr. at 321), specifically stating "[n]o evidence of fracture or joint effusion," "no evidence of ... bone bruise," "[n]o osteochondral defects," "no stress fractures" (Tr. at 321).

Nevertheless, on April 5, 2000, Dr. Faierman operated on Hill's left ankle and removed a calcific mass (Tr. at 319).

**Medical Records Related to Hill's Left Knee.** As with the medical records related to Hill's left ankle, the bulk of the medical records from Dr. Memoli related to Hill's left knee are reports submitted to the Workmen's Compensation Board. These reports are comprised of an intake form (Tr. at 322), Attending Doctor's Report forms (Tr. at 323–26),[7] billing forms,[8] brief two– to four-sentence progress notes attached to the billing forms,[9] and requests

**6.** Dr. Memoli requested authorization for an MRI of Hill's left ankle on October 12, 1994 (Tr. at 262), on April 16, 1996 (Tr. at 264), and on June 18, 1996 (Tr. at 267). Dr. Memoli also requested arthroscopic evaluation and surgery for the left ankle on May 20, 1997 (Tr. at 273), on August 8, 1997 (Tr. at 276), on November 18, 1997 (Tr. at 279), on April 13, 1998 (Tr. at 281).

**7.** Dr. Memoli submitted four Attending Doctor's Reports related to Hill's left knee, which he diagnosed as having an "internal derangement" of the left knee with "probable torn meniscus" (Tr. at 323). Such reports were submitted on March 15, 1995 (Tr. at 323), May 17, 1995 (Tr. at 324), and July 24, 1996 (Tr. at 325). During this period, Dr. Memoli noted that Hill had continued to work despite pain. *See, e.g.* Tr. at 323, 324, 325. What Dr. Memoli wanted to do, subject to the MRI, was to perform "arthroscopic surgery to the left knee." *Id.*

**8.** Dr. Memoli submitted billing forms related to Hill's left knee beginning on September 29, 1995 and ending on December 12, 17, 2001. (Dr. Memoli also submitted billing reports past the period of time for which Hill is entitled to disability insurance benefits. *See, e.g.,* Tr. 421–25.) These billing reports all indicated as a diagnosis "knee internal derangement" and "knee medial meniscus tear" and that Hill was "working in spite of pain." *See, e.g.* Tr. at 326. Dr. Memoli submitted billing forms for Hill's left knee on September 29, 1996 (Tr. at 326), November 28, 1995 (Tr. at 328), January 31, 1996 (Tr. at 329), March 22, 1996 (Tr. at 332), May 8, 1996 (Tr. at 335), July 10, 1996 (Tr. at 338), October 17, 1996 (Tr. at 339), October 17, 1996 (Tr. at

341), February 3, 1997 (Tr. at 344), March 17, 1997 (Tr. at 347), April 14, 1997 (Tr. at 350), June 3, 1997 (Tr. at 353). Starting on July 14, 1997, Dr. Memoli added a third diagnosis of "lateral subluxing patella [of the left] knee" to the first two diagnosis. Billing forms with these three diagnoses were submitted on July 14, 1997 (Tr. at 493), July 21, 1997 (Tr. at 356), October 20, 1997 (Tr. at 258), November 6, 1997 (Tr. at 360), February 10, 1998 (Tr. at 363), March 31, 1998 (Tr. at 366), June 2, 1998 (Tr. at 369), July 21, 1998 (Tr. at 372), September 28, 1998 (Tr. at 375), November 16, 1998 (Tr. at 378), and January 5, 1999 (Tr. at 381). Starting on April 6, 1999, Dr. Memoli added a fourth diagnosis of "torn lateral meniscus tear" of the left knee (Tr. at 382). Dr. Memoli submitted billing reports with these four diagnoses on April 6, 1999 (Tr. at 382), May 21, 1999 (Tr. at 385), July 6, 1999 (Tr. at 388), September 16, 1999 (Tr. at 391), October 22, 1999 (Tr. at 394), December 13, 1999 (Tr. at 397), March 13, 2000 (Tr. at 400), September 26, 2000 (Tr. at 404), December 8, 2000 (Tr. at 406), February 9, 2001 (Tr. at 409), April 23, 2001 (Tr. at 411), July 25, 2001 (Tr. at 413), August 13, 2001 (Tr. at 415), October 15, 2001 (Tr. at 417), December 17, 2001 (Tr. at 419). Some of the latter billing reports also noted a strained right knee (Tr. at 385, 388, 391, 394, 397, 400, 404, 406, 409, 411, 413, 415, 417, 419).

**9.** Dr. Memoli's progress notes related to Hill's right knee frequently stated that Hill had "persistent pain, swelling, and intermittent buckling and locking" of his left knee (Tr. at 330 (January 30, 1996 progress note), 334 (May 7, 1996 progress note), 337 (July 9, 1996 progress note)). The progress note of July 9,

for authorization for various types of therapies and tests.[10] A progress note three months following surgery to the left knee notes "improvement" but continued "pain and weakness" (Tr. at 384). Dr. Memoli operated to correct the torn medial meniscus of the left knee on October 4, 1996 (Tr. at 429–30). Dr. Faierman conducted a follow up surgery on the left knee to correct a lateral meniscal tear on February 17, 1999 (Tr. at 558).

During the entire period for which medical records are provided the record contains evidence of only one MRI conducted on Hill's left knee, which occurred prior to his October 4, 1996 surgery.[11] Dr. Memoli ordered an MRI of Hill's left knee in August 1995, following the accident of March 1995. Dr. Jack L. Baldassare ("Baldas-

sare"), a board-certified radiologist, reported that there was a tear of the posterior horn of the medial meniscus but that in all other regards the left knee was normal (Tr. at 202). Dr. Memoli did not requests any authorizations for an MRI of Hill's left knee following the operation and Hill's continued complaints although he did request authorization for additional arthroscopic surgery. See supra n. 9.

On July 31, 1998, Dr. Memoli completed a form letter provided by Hill's attorney, in which he stated that Hill could not "stand, walk, ... climb, kneel, [or] sit for any period" (Tr. at 225). On the same date, Dr. Memoli also completed a form provided by Hill's attorney related to Listing 1.03 ("arthritis of a major weight-bearing joint") (Tr. at 227–28); see also Tr. at

1996, past the date for which Hill applied for disability insurance benefits, indicated that he was still "working" (Tr. at 337). The progress notes following Hill's surgery stated that Hill had "pain and swelling," (Tr. at 340 (progress note for October 17, 1996,)) and "intermittent locking of the left knee." (Tr. at 343 (progress note for February 3, 1997.)) Dr. Memoli also noted "popping and buckling of the left knee" (Tr. at 346 (March 17, 1997)). Similar progress notes continued from April 14, 1997 to July 14, 1997. See, e.g., Tr. at 349 (April 14, 1997 progress note stating "still ... pain left knee"), 352 (June 2, 1997 progress note stating "still persistent intermittent swelling and buckling left knee"), 355 (July 14, 1997 progress note stating "increased pain and swelling and loud popping"). Dr. Memoli reported "no change" in Hill's "complaints and physical findings" on February 10, 1998 (Tr. at 362). Similar progress reports continued. See, e.g., Tr. at 365 (March 31, 1998), 368 (June 2, 1998), 370 (July 21, 1998), 374 (September 28, 1998), 377 (November 16, 1998), July 6, 1999 (Tr. at 387). A progress report of September 16, 1999 noted "still persistent buckling, pain and swelling [of the] left knee" (Tr. at 390). Dr. Memoli reported that Hill's left knee was improving with physical therapy but had continued symptoms on October 22, 1999 (Tr. at 393), December 13, 1999 (Tr. at 396), March 13, 2000 (Tr. at 399 ("much improved")),

April 24, 2000 (Tr. at 402 (same)), September 26, 2000 (Tr. at 403) ("no change both in complaints and physical findings"), November 20, 2000 (Tr. at 405 (same)), January 22, 2001 (Tr. at 408 (same)), June 15, 2001 (Tr. at 412 (same)), October 15, 2001 (Tr. at 416 (same)), and December 17, 2001 (Tr. at 418 (same)).

**10.** Dr. Memoli submitted requests for the following authorizations: for hospitalization for arthroscopy and medial mensicotomy of the left knee on November 22, 1995 (Tr. at 327), March 14, 1996 (Tr. at 331), and May 7, 1996 (Tr. at 333). Dr. Memoli requested authorization for physical therapy for Hill on February 3, 1997 (Tr. at 342), March 17, 1997 (Tr. at 345), April 14, 1997 (Tr. at 348), July 14, 1997 (Tr. at 354), and October 14, 1997 (Tr. at 357). Dr. Memoli requested authorization for arthroscopic surgery in addition to physical therapy on November 3, 1997 (Tr. at 359), February 10, 1998 (Tr. at 361), March 31, 1998 (Tr. at 364), June 2, 1998 (Tr. at 367), July 21, 1998 (Tr. at 371), September 28, 1998 (Tr. at 373), November 16, 1998 (Tr. at 376), and January 5, 1999 (Tr. at 379), May 21, 1999 (Tr. at 383).

**11.** Dr. Stanley N. Friedman conducted a second MRI on May 29, 2001 of Hill's right knee; the MRI showed "strain" of that knee (Tr. at 432).

247 (January 27, 1999 form from Dr. Memoli to Hill's attorney noting symptoms such as pain, swelling, and popping and Hill's limitations (*i.e.*, that Hill could not stand, walk, bend, climb, kneel, or sit for any period)). In the form, Dr. Memoli noted "pain, swelling, and popping" of the left knee secondary to lateral subluxing[12] patella and that Hill's knee required further surgery (Tr. at 227). Dr. Memoli concluded that Hill was "[t]otally disabled and requires continued ongoing care and surgery to the left knee and left ankle" (Tr. at 227). Dr. Memoli did not reference any laboratory results, such as x-rays or MRIs, to support his conclusion. In both forms dated July 31, 1998 form and January 27, 1999, Dr. Memoli indicated that Hill had been disabled since October 1994, (Tr. 225, 247,) even though the billing records spanning a five-month period in 1995 reported that Hill was "working in spite of pain." *See, e.g.*, Tr. at 323 (March 15, 1995 billing record), 324 (May 17, 1995 billing record), 325 (July 24, 1995 billing record).

Dr. Memoli provided Hill with letters, which were submitted to the Appeals Council, on December 8, 1999 (Tr. at 251) and January 21, 2000 (Tr. at 250), the latter of which listed the various diagnoses related to the left knee (*i.e.*, internal derangement, torn medial and lateral meniscus, post surgeries, lateral subluxinat patella, post surgery) and strained right knee. The January 21, 2000 letter noted that Hill had "complaints of pain and buckling" (Tr. at 250).

Following the Appeal Council's remand to ALJ Arzt, Dr. Memoli prepared a letter dated May 29, 2002 regarding his treatment of Hill (Tr. at 229–35). Dr. Memoli first recounted the history behind Hill's first injury to his left ankle and subsequent July 24, 2000 surgery and concluded that Hill "ha[d] continued to have persistent complaints of intermittent left ankle pain, swelling stiffness and weakness" (Tr. at 231). Dr. Memoli then provided an overview of the medical history related to Hill's left knee. Following the October 4, 1996 surgery and up to July 14, 1997, Dr. Memoli wrote that Hill "continued to have persistent complaints as well as positive physical findings ... secondary to ... lateral subluxing patella" (Tr. at 232). The letter notes that Hill had regular visits with Dr. Memoli and that Hill "had" pain, swelling, intermittent locking, popping and buckling of the left knee (Tr. at 232). On February 17, 1999, a second surgery on the left knee was performed by Dr. Faierman (Tr. at 233). Dr. Memoli stated that Hill, although improved, presented with pain and buckling in March 2000. *Id.* Dr. Memoli ended the letter by noting that an MRI of the right knee showed medial collateral ligament strain. *Id.*

Dr. Memoli stated that Hill could not sit or stand for any prolonged period of time, that he could not walk for any distance, and that he could not kneel, bend, or squat without "severe increased pain, swelling, locking and weakness related to all areas" (Tr. at 234–35). Referring to both "the duration of symptoms" and "persistent physical findings," Dr. Memoli stated that Hill's "condition is progressive, total and permanent" and that it prevents Hill from performing any type of occupation (Tr. at 235).

**Dr. Faierman**

Dr. Eial Faierman conducted the second operation to Hill's left knee on February 17, 1999 (Tr. at 80) and the operation to Hill's left ankle on April 5, 2000 (Tr. at 83). Dr. Faierman conducted a pre-surgery examination and report on January 11, 1999

---

**12.** Subluxation is defined as "[a]n incomplete luxation or dislocation." *Steadman's Medical Dictionary* 1716 (27th ed.2000).

(Tr. at 90). Examination of the left knee showed "full range of motion with tenderness over the medial and lateral joint space." *Id.* Dr. Faierman noted "stability is full including a negative Lachman, anterior drawer and pivot-shift test" and that there was "no varus or valgus instability." *Id.* Dr. Faierman concluded that the course of treatment would involve "left knee diagnostic and operative arthroscopy" (Tr. at 91).

Prior to the April 5, 2000 operation of the left ankle, Dr. Faierman prepared a report dated March 17, 2000, which stated that Hill had "no significant tenderness," "full range of motion," and "no pain on varus stress testing" (Tr. at 85). Dr. Faierman reported some moderate left ankle tenderness and a calcific mass. *Id.* In a post-surgery follow up examination, Hill reported feeling "110 percent better" (Tr. at 89).

### 3. Consultative Physicians

During the relevant period, a series of physicians examined Hill, including physicians who conducted examinations on behalf of The New York State Insurance Fund in relation to workmen's compensation benefits and the Agency.

**Nirou Examination—January 1996.** Dr. Hadereh Nirou conducted an examination of Hill on behalf of the Workers' Compensation Board on January 4, 1996 (Tr. at 488). Dr. Nirou concluded that Hill had a "partial disability" and that arthroscopic surgery of the left knee should be authorized. *Id.*

**Mancheno Examination—December 1996.** Dr. Mario Mancheno conducted an examination on behalf of the Agency on December 20, 1996, approximately three months following Hill's first surgery (Tr. at 181). Dr. Mancheno described Hill's prognosis as "fair," *id.*, and concluded that Hill had: moderate impairments with regard to lifting, carrying, pushing and pushing; mild impairment with regard to standing and walking; and no impairment with regard to sitting (Tr. at 182).

**Cohen Examination—April 1997.** Dr. Herbert G. Cohen ("Cohen") conducted several examinations on behalf of The State Insurance Fund, including April 16, 1997 and November 17, 1997. On November 17, 1997, Cohen did not have any laboratory results, such as x-rays, to examine (Tr. at 203). A report of Cohen's examination of Hill included the following observations: that there was a slight swelling of the left knee compared to the right knee; and that extension of the right and left knees was complete and that flexion of the left knee was limited by only 5 degrees (Tr. at 205). Cohen noted no weakness of the cruciate or collateral ligaments of either the right or the left knee but did report that Hill stated the motions caused discomfort of the left knee. *Id.* Cohen further reported that McMurray tests for medial meniscus injury of both knees were negative. *Id.* Cohen noted a slight swelling of the left ankle and a mass on that ankle that Hill stated caused discomfort. *Id.* However, dorsiflexion, plant flexion, inversion, eversion of both ankles and forefeet were "complete" (Tr. at 206). Cohen concluded that Hill had "a mild partial disability." *Id.*

**Bensam Examination—June 1999.** Dr. Bensam conducted an examination of Hill on June 25, 1999, following both of Hill's operations to his left knee, on behalf of The State Insurance Fund. Dr. Bensam noted that Hill was "quite obese" and that "at 6'1''" Hill weighed 230 pounds (Tr. at 570). Dr. Bensam noted that "[b]oth patellae track laterally, both knees are stable, the right knee has popping as well, [and] the McMurray tests are benign bilaterally." *Id.* Dr. Bensam concluded that he "would not recommend surgery" on the left ankle but that it had already been

authorized. *Id.* Dr. Bensam noted that due to Hill's inability to fully extend the left knee, Hill was "at least temporary [sic] partially markedly disabled" (Tr. at 584). Dr. Bensam also suggested that Hill "should be encouraged to get an orthopedic consultation independent of the State Fund and his treating orthopedic physician." *Id.*

**Heyman Examination—October 1999.** Dr. Norman M. Heyman, an orthopedic surgeon, conducted an orthopaedic consultation on October 28, 1999. In examining Hill's left knee, Dr. Heyman concluded that it had a "full range of motion" (Tr. at 577). Dr. Heyman further noted that the left knee had "a negative anterior draw, negative posterior draw, negative Lehman, negative posteriolateral dropback" and "no sign of internal derangement and no sign of meniscal injury with a negative Steinman test, negative McMurray est, negative Apley Grind test." *Id.* Dr. Heyman concluded that Hill had a "mild/partial disability" with respect to his knee and that Hill could "return to normal daily activities and perhaps even return to work at this time with some restrictions" (Tr. at 578). Dr. Heyman further opined that Hill could "return to full work in 6 weeks without restriction." *Id.*

**Margulies Examination—September 2000.** Dr. Joseph Margulies, an orthopedic surgeon, conducted an independent medical evaluation of Hill on September 7, 2000. Dr. Margulies's examination of the left knee "reveal[ed] full, active and painless range of motion" (Tr. at 597). Dr. Margulies reported that Hill had "[n]ormal quadriceps and hamstring strength" and thighs that were "normal and equal in size." *Id.* The examination showed "no evidence of instability," "[n]egative McMurray's test," "no areas of tenderness, heat, swelling, erythema or effusion." *Id.* An examination of the left ankle likewise "reveal[ed] full, active, painless range of

motion with normal muscle strength in all directions of motion." *Id.* The left ankle showed "no areas of tenderness, heat, swelling, erythema or effusion" and Hill's gait was normal. *Id.* Dr. Margulies opined that "[f]rom an orthopedic point of view there is no need for further treatment including physical therapy." *Id.* Dr. Margulies further concluded that "[b]ased on orthopedic evaluation, [Hill] revealed no functional disability at the present time" and that Hill could "continue with activities of daily living as well as with present employment." *Id.*

**Heyman Examination—March 2001.** Dr. Heyman conducted a second independent medical evaluation on behalf of the Agency on March 20, 2001. Hill reported that following the second left knee operation, this knee no longer popped, locked or gave way (Tr. at 603). At this examination, Hill was able to walk on his heels and toes without difficulty and to do a deep knee bend. *Id.* Hill was able to "almost completely bend on the left knee" and had full range of motion of the left and right knee with full extension. *Id.* Although Dr. Heyman diagnosed Hill with an "[a]cute sprain and strain of the left knee," he concluded that Hill did not have a disability but merely had "mild residuals" (Tr. at 605). Dr. Heyman further reported that "[f]urther treatment is not reasonable, not related and not necessary, as treatment to this date has been excessive." *Id.*

**Epstein Examination—December 2001.** Dr. Menachem Epstein, an orthopedic surgeon, conducted an independent medical examination on behalf of The New York State Insurance Fund on December 17 2001. Dr. Epstein noted that Hill was "an immensely heavy man, weighing at least 280 pounds" and that he was "obese" (Tr. at 625). Dr. Epstein reported that "[t]he left knee show[ed] signs of post arthroscopy with good range of motion, no

local effusion and no instability" and that Hill "did not complain of pain while moving the left knee" (Tr. at 626). Dr. Epstein wrote that in his opinion "no further medical treatment is reasonable, related or necessary" and that Hill's prognosis was "excellent." *Id.* Dr. Epstein concluded that "the degree of disability for the left knee [was] mild" and that "there [was] no disability to the right knee." *Id.*

**Epstein Examination—April 2002.** Dr. Epstein examined Hill once again on April 9, 2002. On this day, among other negative observations, examination of his knees showed "no instability," "no tenderness, heat, swelling, erythema, or effusion," (Tr. at 641,) and an examination of Hill's ankles "revealed normal ranges of motion bilaterally." *Id.* With regard to Hill's prognosis, Dr. Epstein wrote that Hill "is able to work full-time and perform his normal activities" and that he should however "avoid any kneeling or bending." *Id.* Dr. Epstein concluded that based on the Workers' Compensation Board guidelines, Hill had a mild orthopedic disability to his left knee and none to his right knee (Tr. at 642). Dr. Epstein ended by stating that "no future orthopedic treatment is reasonable, related, and necessary." *Id.*

**Mesnick Examination—July 2002.** ALJ Arzt requested a consultative examination on June 24, 2002 (Tr. at 648–49). Dr. Neal Mesnick, an orthopedist, conducted an examination on July 8, 2002 (seven months following Hill's date last insured of December 31, 2001). With regard to both Hill's knees and ankles, Dr. Mesnick reported that "[a]ll ranges of motion [we]re normal" and that "[t]here is no pain on movement and no evidence of swelling, redness or tenderness around the joints" (Tr. at 652–53). An x-ray of the left knee showed "mild joint space narrowing" and Hill had "soft tissue swelling" in his left ankle (Tr. at 653). Dr. Mesnick concluded that Hill "[w]as mildly limited in lifting,

carrying, pushing and pulling heavy objects, long distance ambulation and standing for prolonged periods of time" and that his prognosis was "good." *Id.*

**Liebman X–Ray Examination—July 2002.** ALJ Arzt also requested an x-ray of the left ankle and the left knee. Dr. Lawrence S. Liebman, a certified radiologist, read the x-rays. With regard to Hill's left knee, Dr. Liebman reported that "[t]here was no evidence of acute fracture, dislocation or destructive bony lesion," that the "joint spaces are relatively well maintained," and that there was "[s]oft tissue swelling" (Tr. at 654). With regard to Hill's left knee, Dr. Liebman reported that there was "no evidence of acute fracture, dislocation or destructive bony lesion" and that there was "mild narrowing of the medial compartment." *Id.* Dr. Liebman's impression with regard to Hill's knee was that it was a "suboptimal study" and that there was "mild joint space narrowing." *Id.*

### C. Administrative Decisions Rendered Below

**The ALJ's September 1998 Decision.** On September 14, 1998, ALJ Arzt denied Hill's claim for disability insurance benefits. In a seven-page decision, ALJ Arzt found that Hill had "severe" impairments of the left ankle and left knee, but that these impairments did not meet or equal any listed impairment (Tr. at 54). ALJ Arzt further found that Hill's statements of disabling symptoms and limitations were not supported by the objective medical record, and that objective medical evidence showed that Hill had a residual functional capacity to engage in sedentary work and was thus not disabled as defined under the applicable statute and regulations. *Id.*

**The Appeals Council's July 2001 Remand.** On July 10, 2001, the Appeals

Council's remanded the case back to the ALJ to comply with 20 C.F.R. § 404.1512 by conducting an "adequate evaluation" of Dr. Memoli's finding that Hill was totally disabled and could not "stand, walk, bend, climb, kneel or sit for any period" (Tr. at 96). The Appeals Council's decision noted that ALJ Arzt should have recontacted Dr. Memoli to clarify inconsistencies in the record and instructed ALJ Arzt to consider new additional evidence Hill had submitted to the Appeals Council regarding his left ankle. *Id.*

**The ALJ's Second January 2003 Decision.** On January 30, 2003, ALJ Arzt issued a thirteen-page decision following a hearing conducted on June 12, 2002 (Tr. at 16). The ALJ found Hill not to be disabled under the Act and implementing regulations (Tr. at 29). More particularly, ALJ Arzt found that Hill's "statements throughout the record regarding his disabling symptoms and functional limitations are generally credible, but do not support a finding that the claimant is disabled" (Tr. at 28). ALJ Arzt noted that Dr. Memoli's clinical notes from 1996 to May 2002 contained "sparsely written" notations containing "usually mild objective clinical findings" (Tr. at 24). In addition, ALJ Arzt found that, although "[a]ll of Dr. Memoli's reports stated that [Hill] [wa]s disabled," there "is no evidence that the claimant is not fully weight-bearing on his left leg or has significant range of motion deficits of his left knee since recovery from surgery." *Id.* The ALJ concluded that "[t]he mild findings since [Hill's] recovery from the knee surgery in Dr. Memoli's and the other physician's [sic] reports do not support Dr. Memoli's opinion that the claimant is disabled." *Id.*

## DISCUSSION

### I. Applicable Law

#### A. Determination of Disability

"To be 'disabled' under the Act and therefore entitled to benefits, a claimant must demonstrate an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months'." *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (citing 42 U.S.C. § 423(d)(1)(A)). Furthermore, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step procedure for evaluating disability claims. 20 C.F.R. § 404.1520. The five-inquiry entails the following steps. At the first step, the Agency considers the claimant's work activity, if any, and if the claimant is engaged in substantial gainful activity, the Agency will find that the claimant is not disabled. § 404.1520(a)(4)(I). At the second step, the Agency considers the medical severity of the claimed impairments. If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement, the Agency we will find that the claimant is not disabled. § 404.1520(a)(4)(ii). At the third step, the Agency also considers the medical severity of the claimed impairment. If the claimed impairments "meet[ ] or equal[ ] one of [the] listings in appendix 1 of this subpart and meet[ ] the duration requirement," the Agency will find that the claimant is disabled. § 404.1520(a)(4)(iii). At the fourth step, if the claimed impairments do not meet or equal a listing, the Agency considers its assessment of the claimant's residu-

al functional capacity and his past relevant work. If the claimant can still do his past relevant work, the Agency will find that the claimant is not disabled. § 404.1520(a)(4)(iv). At the fifth and last step, the Agency considers its assessment of the claimant's residual functional capacity and his age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the Agency will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the agency will find that the claimant is disabled. § 404.1520(a)(4)(v).

### B. Standard of Review

■ "It is not [the court's] function to determine *de novo* whether [a plaintiff] is disabled." *Rosa,* 168 F.3d at 77. "[An] ALJ's decision [is set aside] only where it is based upon legal error or is not supported by substantial evidence." *Id.* (citing *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998)). "Substantial evidence is 'more than a mere scintilla[;][i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'." *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted)). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel,* 177 F.3d 128, 132 (2d Cir. 1999) (citation omitted). Moreover, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the courts] will not substitute [their] judgment for that of the Commissioner." *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002).

## II. Application

### A. The ALJ Complied with the Treating Physician Rule and § 404.1527(d)

Hill argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not comply with various aspects of the treating physician rule, which are governed by regulation, including 20 C.F.R. §§ 404.1512 and 404.1527.

### 1. Compliance with 20 C.F.R. § 404.1512

■ Hill argues that ALJ Arzt violated 20 C.F.R. § 404.1512 anew by failing to recontact Dr. Memoli a second time following the remand and that the ALJ had an affirmative duty to contact Dr. Memoli yet again after the ALJ determined that Dr. Memoli's records were "sparse." Memorandum of Law in Support of Plaintiff's Cross–Motion for Judgment on the Pleadings 17–18 [hereinafter Pl.'s Mem. Supp. J. Pleadings]. Neither the regulations nor the Appeals Council's Order provide a basis for a third bite of the apple. The ALJ considered Dr. Memoli's records in the first decision. Following the Appeals Council's remand, the ALJ subpoenaed Dr. Memoli's records (Tr. at 30). As noted more fully below, the ALJ's decision reflects that the ALJ considered Dr. Memoli's records and reports (Tr. at 21–24). In view of Dr. Memoli's records—*i.e.,* that they contained "usually mild objective clinical findings" and were "sparsely written" (Tr. at 24)—and especially in light of the entire record in the case and all of the conflicting nontreating medical source opinion, the ALJ was justified in not affording Dr. Memoli's opinion controlling weight. Moreover, having complied with both the regulation and the remand order, the ALJ did not have to re-contact Dr. Memoli yet again and provide him with

still another opportunity to submit additional information.

The Appeals Council Order remanded the case back to ALJ Arzt pursuant to § 404.1512. Under this provision, the Agency has a "responsibility" to develop a "complete medical history." 20 C.F.R. § 404.1512(d). When the information received from a treating source is insufficient for the Agency to make a determination, the Agency has an affirmative duty to recontact medical sources. 20 C.F.R. § 404.1512(e). In this Circuit, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel'." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir.1999) (citations omitted); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000) (same).

When gaps in the medical record exist, implementation regulations explain that:

(1) [The Agency] will first recontact [the claimant's] treating physician . . . to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source. . . .

(2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary finding.

§ 404.1512(e)(1) & (2). Further, if the information the Agency requires in order to make the determination is not readily available from the records of the treating source, or the Agency is unable to obtain clarification from the treating source, the Agency can require the claimant to undergo a consultative examination. § 404.1512(f).

The Order of the Appeals Council remanded the case to the ALJ because ALJ Arzt "did not recontact the treating physician to clarify any inconsistency" (Tr. at 96). The Order further instructed the ALJ to "consider the new evidence" Hill submitted to the Appeals Council and "[a]s appropriate" to "obtain updated medical records from the claimant's treating and other medical sources" (Tr. at 97). The Order stated that "[i]f the evidence does not adequately clarify the record, the [ALJ] *may* wish to recontact the medical sources for further information." *Id.* (emphasis added). The Order further indicated that "[i]f the additional evidence does not clearly depict the claimant's limitations, the [ALJ] may obtain a consultative examination, including a medical source statement about what the claimant can do despite his . . . impairments." *Id.*

The ALJ below fully complied both with § 404.1512 and with the Appeals Council Order. Following the remand, the ALJ subpoenaed Hill's treating physician, Dr. Memoli (Tr. at 30). The subpoena required Dr. Memoli's appearance at the Hearing held on June 12, 2002 and his submission of "all clinic notes since January 1, 1996 and any other evidence in [his] possession relating to the above matter" (Tr. at 30). Dr. Memoli did not appear at the Hearing but did submit a full copy of the medical records related to Hill, most of which, as stated before, comprised of workmen's compensation reports, billing records, and progress notes. In addition,

Dr. Memoli submitted a six-page letter dated May 29, 2002, which provided a medical history of Hill's and a summary of his examinations of Hill's left ankle and left knee, his diagnosis, and his prognosis (Tr. 229–35).

Subpoenaing Dr. Memoli's records responded fully to the Appeal Council's Order to recontact the treating source (Tr. at 96) and, "as appropriate," to obtain "updated medical records from the claimant's treating ... sources" (Tr. at 97). Obtaining the treating source's medical records is also fully compliant with § 404.1512(e)(1)'s statement that "requesting copies of [the] medical source's records" is one way to "seek additional evidence or clarification from [the] medical source" when recontacting that source. 20 C.F.R. § 404.1512(e)(1).

Moreover, the Order specifically states that "[i]f the evidence does not adequately clarify the record, the [ALJ] *may* wish to recontact the medical sources for further information" or "obtain a consultative examination." *Id.* (emphasis added). Following the subpoenaing of Dr. Memoli's records and receipt of Dr. Memoli's May 29, 2002 letter, the ALJ chose not to recontact Dr. Memoli a second time and, instead, ordered two consultative examinations. *See, e.g.,* Tr. at 648–49 (ALJ Arzt's order of an orthopedic consultative examination by Dr. Mesnick); Tr. at 654 (ALJ Arzt's order of an x-ray of Hill's left ankle and left knee, which Dr. Liebman read and interpreted); *see also* 20 C.F.R. § 404.1512(e)(2) ("We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary finding."). In sum, "[t]he ALJ had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability," *Perez v. Chater,* 77 F.3d

41, 48 (2d Cir.1996), and the ALJ was not required to re-contact Dr. Memoli anew.

### 2. Compliance with 20 C.F.R. § 404.1527 Generally

■ Hill further argues that ALJ Arzt improperly reviewed the medical evidence and failed to observe the treating physician rule. Pl.'s Mem. Supp. J. Pleadings 15–17. The treating physician rule is implemented by 20 C.F.R. § 404.1527(d)(2). This provision provides as follows:

Generally, we give more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.*

*Id.* (emphasis added). Where however, the treating source's opinion is either *not* supported by medically acceptable clinical and laboratory diagnostic techniques or conflicts with other substantial evidence in the case record, the Agency does not give the treating source's opinion controlling weight. *Snell v. Apfel,* 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion, ... that opinion will not be deemed controlling."). Moreover, "the less consistent that [a treating source's] opinion is with the record as a whole, the

less weight it will be given." *Id.* (citation omitted); *see also* § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight [the Agency] will give to that opinion.").

As the following analysis shows, Dr. Memoli's own opinion at times reflected inconsistencies with his own medical records. Dr. Memoli's opinion was also inconsistent with that of the other treating medical source, Dr. Faierman, and with Hill's own statements to nontreating medical sources and at the hearings. Moreover, the record, which spans a period of eight years (*i.e.,* from November 7, 1994 (Tr. at 255) to April 1, 2002 (Tr. at 305)), contains very little in the way of medical evidence in support of Dr. Memoli's opinion that stems from "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(d)(2). Further, Dr. Memoli's opinion was strikingly and repeatedly inconsistent with that of numerous nontreating medical sources over almost the entire period reflected in the case record. This case, thus, presents a record where the substantial evidence in the record overwhelmingly supported the ALJ's determination that Hill did not qualify for disability benefits.

**Treating Sources—Dr. Memoli and Dr. Faierman.** As mentioned previously, the record contains instances when Dr. Memoli expressed an opinion that conflicted with his own prior observations or reports. For instance, in forms provided by Hill's counsel dated July 31, 1998 and January 27, 1999, Dr. Memoli indicated that Hill had been disabled since October 1994 (Tr. 225, 247). Dr. Memoli, however, submitted workmen's compensation billing records spanning a five-month period in 1995 in which he reported that Hill was "working in spite of pain." *See, e.g.,* Tr. at 323 (March 15, 1995 billing record), 324 (May 17, 1995 billing record), 325 (July 24, 1995 billing record).

Dr. Memoli's more extensive May 29, 2002 letter is either internally contradictory or conflicts with other substantive evidence in the record. For example, Dr. Memoli wrote that following the injury to the left ankle Hill "remained totally disabled from work" (Tr. at 230), yet—as noted above—Hill returned to work within a month. *Id.* Many of the physical findings that Dr. Memoli cited in his letter are contradicted either by Hill's own statements or other substantive evidence. Dr. Memoli stated that Hill "cannot ambulate for any distance without increased symptoms related to all areas" (Tr. at 234), but Hill himself testified at the second hearing that he could walk for half an hour before having to rest (Tr. at 718). Dr. Memoli opined that Hill was unable to "bend or squat without severe increased pain, swelling, locking and weakness related to all areas" (Tr. at 235). The record, however, contains evidence that Hill could "almost completely bend the left knee" and, as well, do a "deep knee bend" (Tr. at 603). Several examining physicians further noted that Hill could move without pain (*see, e.g.,* Tr. at 626, 652–53).

In addition, the great majority of Dr. Memoli's medical records are comprised of workmen's compensation billing records, which contain very brief descriptions primarily of Hill's symptoms—*i.e.,* invariably complaints of pain—without any mention of any medically acceptable clinical and laboratory diagnostic techniques. Unlike the nontreating examining medical reports in the record, which detailed the clinical diagnostic techniques utilized and physical findings found during various examinations of Hill (*see, e.g.,* Tr. at 181, 205–06, 577, 597, 603), Dr. Memoli almost invariably failed to report any clinical diagnostic techniques utilized to examine Hill or to describe what the physical findings were that such techniques revealed upon examination. Only two exceptions exist. Dr. Me-

moli did specify both techniques and physical findings in a number of progress notes submitted to the Workmen's Compensation Board early on after Hill's injuries (Tr. at 255, 324, 325, 330, 333, 337). For the remainder of the time and over the eight years covered by the case record, this Court uncovered only one instance when a progress note indicated a physical finding—*i.e.,* popping of the knee—which Dr. Memoli specified occurred upon examination (Tr. at 355 "loud popping, left knee, secondary to on exam, lateral subluxing patella").

The remainder of the time, Dr. Memoli simply noted "examination" (Tr. at 256, 257, 258, 259, 265, 268, 271, 274, 277, 349, 352, 358, 362, 365, 368, 370, 374; *see also* 260, 261, 263, 360 ("exam")). In many of these progress notes, Dr. Memoli stated "no change in patient's complaints and physical findings" but provided no further information such as, for example, what the physical findings were or the clinical diagnostic techniques that revealed those physical findings (Tr. at 277; *see also* Tr. at 280, 282, 283, 284, 289, 293, 295, 299, 301, 305, 358, 360, 362, 365, 368, 370, 374, 377, 387, 403, 405, 408, 410, 416, 418, 420, 422, 424). The physical finding Dr. Memoli would most frequently noted was "swelling" of either the left ankle (Tr. at 255, 256, 258, 259, 274, 277, 287, 291, 295,) or the left knee (Tr. at 352, 362, 365, 368, 370, 374, 377, 390). And, as noted previously, over an eight-year period, the record contains a total of three laboratory findings for three separate joints, none of which were conducted after surgery and Hill's continued complaints (Tr. at 202 (left knee, August 1995), 321 (left ankle, April 1997), 432 (right knee, May 2001)).

Dr. Memoli's medical records also conflict with those of Dr. Faierman, Hill's other second treating physician and orthopedic surgeon. On June 2, 2000, during a post-operative examination following surgery to the left ankle, Dr. Faierman reported that Hill "fe[lt] 110% better" and that Hill "wishes to return to work" (Tr. at 89). On July 24, 2000, Hill returned to Dr. Memoli and, although Dr. Memoli noted that Hill returned "with improvement" (Tr. at 287), he indicated in the billing record that Hill had a "total" disability (Tr. at 288).

Hill's own statements to nontreating medical sources further undercut Dr. Memoli's opinion. For example, in March 2001, Hill reported to Dr. Heyman that following the second left knee operation, this knee no longer popped, locked or gave way (Tr. at 603)—yet Dr. Memoli's progress notes for January and April for that year state that there was "no change" regarding Hill's "complaints" and "physical findings" (Tr. at 408, 410).

In addition, Dr. Memoli continually sought further authorizations alternately for physical therapy, medication, and follow up care during periods of time when other examining medical sources opined that further treatment was not necessary. *Compare* Tr. at 597 (on September 7, 2000, stating that "[f]rom an orthopedic point of view there is no need for further treatment including physical therapy"), 605 (on March 20, 2001, stating "[f]urther treatment is not reasonable, not related and not necessary, as treatment to this date has been excessive"), 625 (on December 17, 2001, stating "no further medical treatment is reasonable, related or necessary"), *with* Tr. at 598 (on September 26, 2000, Dr. Memoli prescribing continued medication and requesting authorization for physical therapy three times weekly), Tr. at 615 (on April 23, 2001, same), Tr. at 638 (on April 1, 2002, Dr. Memoli ordering that Hill "continue with medication and follow up care").

Finally, Dr. Memoli frequently mentioned that Hill remained disabled (Tr. at

232, 233, 235). Implementing regulations specifically provide that the Agency, and the Agency alone, makes the determination whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). For example, § 404.1527(e) expressly provides that "statements by a medical source that [the claimant] [is] 'disabled' or 'unabled to work' does not mean that [the claimant is] disabled." § 404.1527(e)(1). Other determinations that are reserved to the Commissioner include whether a claimant's impairments meet or equal a listed impairment and a claimant's residual functioning capacity. § 404.1527(e)(2). Thus, Dr. Memoli's repeated statements that Hill was disabled, by themselves, do not factor at all into the disability determination. *Snell,* 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

\* \* \* \* \* \*

As shown below, Dr. Memoli's opinion repeatedly and strikingly conflicted with that of nontreating medical sources throughout the period in the case record.

**Dr. Mancheno.** Following Hill's October 4, 1996 surgery on his knee, Dr. Memoli's progress note indicated "[s]till pain and swelling" two-weeks following surgery (Tr. 340) and "persistent pain, swelling and intermittent locking of the left knee" five months following surgery (Tr. 343). During this examination, Dr. Memoli also noted "[s]till diffuse pain and quad atrophy and swelling on exam." *Id.* On March 17, 1997, six months following the surgery, Dr.

Memoli noted "still persistent pain, popping and buckling of the left knee" and "[s]till persistent restricted range of motion" (Tr. at 346).

By contrast, Dr. Mancheno's examination on December 20, 1996, almost three months following surgery, showed "[n]o signs of effusion" [13] (*i.e.*, no inflammation) (Tr. at 181). Moreover, Dr. Mancheno indicated "[t]here is crepitation,[14] *no swelling,* tenderness in medial aspect." *Id.* (emphasis added). With regard to muscle atrophy, Dr. Mancheno noted "[n]o signs of asymmetry, muscle wasting or atrophy." *Id.* Dr. Mancheno did report, however, that the left knee did not have a full range of motion. *Id.* Dr. Mancheno concluded that Hill's impairments were as follows: moderate impairments with regard to lifting and carrying; mild impairments with regard to standing and walking; moderate impairments with regard to pushing and pulling; and no impairments with regard to sitting (Tr. at 182). Unlike Dr. Mancheno, Dr. Memoli had characterized Hill's disability as "total" in his February 3, 1997 billing form (Tr. at 344).

**Dr. Cohen.** Dr. Cohen examined Hill on behalf of The New York State Insurance Fund on November 17, 1997, over two years after the first surgery (Tr. at 203–06).[15] Dr. Cohen reported as follows:

There was a slight swelling noted of the left knee, in comparison to the right knee. There was no atrophy and no discoloration of the right and left knees.... Extension of the right and

---

**13.** Effusion is defined as "the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity." *Steadman's Medical Dictionary* 570 (27th ed.2000).

**14.** Crepitation is defined as the "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." *Steadman's Medical Dictionary* 424 (27th ed.2000).

**15.** Approximately one year-and-a-half following Hill's October 4, 1996 surgery to the left knee, on April 16, 1996, Dr. Cohen conducted an examination on behalf of The New York State Insurance Fund, related to Hill's workmen's compensation benefits (Tr. at 203). A report of this examination, however, is not in the record.

left knees were complete. Flexion of left knee was limited by 5 degrees. Flexion of the right knee was complete. The claimant stated the motions cause discomfort of the left knee but not of the right knee. There was no weakness of the cruciate or collateral ligaments noted of the right and left knee. McMurray tests for medial meniscus injury of the right and left knees were negative.... There was slight swelling noted of the left ankle.... There was no atrophy and no discoloration noted fo the right and left ankles.... Dorsiflexion, plant flexion, inversion, eversion of the right and left ankles ... were complete (Tr. at 206).

Dr. Cohen concluded that Hill had "a mild partial disability" (Tr. at 206).

Dr. Memoli's opinion conflicts directly with that of Dr. Cohen. On November 11, 1997, Dr. Memoli examined Hill and reported "still persistent lateral subluxing left patella, continue physical therapy [twice] weekly, [patient] requires surgery to the left knee" (Tr. at 360). Moreover, Dr. Memoli checked off Hill as having a "total" disability (Tr. at 360).

**Dr. Bensam.** The next consultative examination in the record was conducted by Dr. Bensam on June 25, 1999, following both of Hill's operations on his left knee (Tr. at 570). With regard to Hill's knees, Dr. Bensam wrote that "[b]oth patellae track laterally, both knees are stable, the right knee has popping as well, the McMurray tests are benign bilaterally." *Id.* Dr. Bensam further noted that Hill could extend his right knee fully and that he lacked ten degrees of active extension of his left knee but that passive extension was complete. *Id.* With regard to Hill's left ankle, Dr. Bensam noted that he would not recommend surgery but that it had already been authorized. *Id.* Dr. Bensam did not note complaints of pain, buckling, locking or any other problem with Hill's

left knee. In addition, while Dr. Bensam mentioned that the left ankle had areas of tenderness, he did not report any swelling, tenderness or effusion of the left knee. *Id.* Dr. Bensam concluded that, based on Hill's inability to fully extend the left knee, Hill was "at least temporary [sic] partially markedly disabled" (Tr. at 584).

During the same period, in a July 6, 1999 progress note, Dr. Memoli reported "[s]till persistent complaints and positive physical findings" (Tr. at 568). Dr. Memoli failed to note what those physical findings were, but dutifully noted Hill's continued complaints of "[s]till pain and weakness and now also pain in the right knee from favoring the left." *Id.* Based on the continuing complaints of pain, Dr. Memoli indicated that Hill had a "total" disability, as opposed to Dr. Bensam's opinion that Hill had a "partial" disability (Tr. at 567).

**Dr. Heyman—1999 Examination.** Dr. Heyman, an orthopedic surgeon, conducted an orthopedic consultative examination on October 28, 1999. Dr. Heyman's report concluded the following regarding Hill's left knee: that it had a "full range of motion" (Tr. at 577), that it had "a negative anterior draw, negative posterior draw, negative Lehman, negative posteriolateral dropback," and "no sign of internal derangement and no sign of meniscal injury with negative Steinman test, negative McMurray test, [and] negative Apley Grind test." *Id.* Dr. Heyman further opined that "[t]here is no need for [Hill's] crutch" and that he "did not believe [Hill] requires surgery on his left foot and left ankle" (Tr. at 578). Dr. Heyman concluded that Hill had:

a mild/partial disability with respect to his knee and his major difficulty is muscle function, which is decreased on the left side. Attention needs to be directed to quadriceps, hip flexor and knee flex-

or functioning. If physical therapy is to be continued, emphasis should be made on exercises [sic] these muscles against progressive resistance. Primary attention to muscle strengthening should be done at home rather than in therapy. He should have 3 weeks minimum and 6 weeks maximum of therapy and be re-examined at the end of that time.... I believe that he can return to normal daily activities and perhaps even return to work at this time with some restrictions and should be able to return to full work in 6 weeks without restriction.

(Tr. at 577–78.)

Dr. Memoli's progress note for an examination conducted six days prior to Dr. Heyman's, on October 22, 1999, states that Hill's "left knee [is] improving with physical therapy," but noted that Hill still had "clicking, buckling and pain," and that Hill should continue physical therapy three times a week (Tr. at 393). Notably, Dr. Memoli did not identify any medically acceptable clinical technique to indicate that he had observed the physical findings himself versus simply noting Hill's subjective complaints and symptoms. On that day, Dr. Memoli also requested authorization for physical therapy three times weekly, hospitalization, and surgery (Tr. at 392). Moreover, billing reports for the months during that period of time—submitted on September 16, 1999 (Tr. at 391), on October 22, 1999 (Tr. at 394), and on December 13, 1999 (Tr. at 397)—each describe Hill's disability as "total"—in stark contrast to Dr. Heyman's assessment.

**Dr. Margulies.** Dr. Margulies, an orthopedic surgeon, conducted an independent medical examination on September 7, 2000. Dr. Margulies's report stated as follows:

Examination of the left knee reveals full, active and painless range of motion. Normal quadricepts and hamstring strength. The thighs are normal and equal in size. There is no evidence of instability. Negative McMurray's test. There are no areas of tenderness, heat, swelling, erythema or effusion. The apprehension test is negative.

Examination of the left ankle reveals full, active, painless range of motion with normal muscle strength in all directions of motion. There are no areas of tenderness, heat, swelling, erythema or effusion. The gait is normal. Neurovascular status of the foot is intact ... There is no evidence of nerve damage. There is a small area of swelling around the lateral malleolus.

. . . .

From an orthopedic point of view there is no need for further treatment including physical therapy.

. . . .

Based on orthopedic clinical evaluation, the claimant revealed no functional disability at the present time. The claimant may continue with activities of daily living as well as with present employment.

(Tr. at 597.)

During the same period, Dr. Memoli's progress notes and billing reports are in direct conflict with Dr. Margulies's opinion. With regard to Hill's left knee, Dr. Memoli's brief progress note for September 26, 2000—three weeks after Dr. Margulies's independent, orthopedic examination—states *en toto* as follows: "No change both in patient's complaints [and] physical findings. Still pain. Continue medication. Requesting authorization for physical therapy [three times] weekly [and] MRI right knee as feel right knee is consequential" (Tr. at 598). With regard to Hill's left knee, Dr. Memoli describes Hill's disability as "moderate partial disability" and that the "condition [is] permanent and ongoing" (Tr. at 404 (left knee)). With regard to Hill's left ankle, Dr. Memo-

li wrote on September 18, 2000, that Hill had a total disability (Tr. at 290), that there was "no change both in patient's complaints [and] physical findings," "still pain," and that Hill should "continue soaks, exercises and medication as needed" (Tr. at 289).

**Dr. Heyman—2001 Examination.** Two years after his first examination, Dr. Heyman conducted a second independent medical evaluation on behalf of the Agency on March 20, 2001. Hill reported that following the second left knee operation, this knee no longer popped, locked or gave way (Tr. at 603). At this examination, Hill was able to walk on his heels and toes without difficulty and to do a deep knee bend. *Id.* Hill was able to "almost completely bend on the left knee" and had full range of motion of the left and right knee with full extension. *Id.* Although Dr. Heyman diagnosed Hill with an "[a]cute sprain and strain of the left knee," he concluded that Hill did not have a disability but merely had "mild residuals" (Tr. at 605). Dr. Heyman further reported that "[f]urther treatment is not reasonable, not related and not necessary, as treatment to this date has been excessive." *Id.*

Once again, Dr. Memoli's progress notes for examinations conducted around this period of time are in direct conflict with Dr. Heyman's opinion. In billing records related to Hill's left ankle for February 16, 2001 and May 18, 2001, Dr. Memoli once again characterized Hill's disability as "total" (Tr. at 294, 296). Progress notes for examinations conducted during this period state that "patient returns with persistent complaints [and] positive findings" and "persistent pain" (Tr. at 293). *See also* Tr. at 297 ("patient returns with persistent intermittent pain and stiffness of the left ankle").

**Dr. Epstein.** Dr. Epstein, another orthopedic surgeon, conducted independent medical examinations on behalf of The New York State Insurance Fund on December 17, 2001 and on April 9, 2002. At the first examination, Dr. Epstein noted that Hill walked "with a wobbly gait" but "no obvious limp or cane" (Tr. at 625). Dr. Epstein also reported that "[t]he left knee show[ed] signs of post arthroscopy with good range of motion, no local effusion and no instability" and that Hill "did not complain of pain while moving the left knee" (Tr. at 626). Dr. Epstein wrote that in his opinion "no further medical treatment is reasonable, related or necessary" and that Hill's prognosis was "excellent." *Id.* Dr. Epstein concluded that "the degree of disability for the left knee [was] mild" and that "there [was] no disability to the right knee." *Id.*

During Dr. Epstein's second examination of Hill, he noted that Hill's knees revealed "no instability," "no tenderness, heat, swelling, erythema, or effusion," (Tr. at 641,) and that Hill's ankles "revealed normal ranges of motion bilaterally." *Id.* With regard to Hill's prognosis, Dr. Epstein wrote that Hill "is able to work full-time and perform his normal activities" and that he should however "avoid any kneeling or bending." *Id.* Dr. Epstein concluded that based on the Workers' Compensation Board guidelines, Hill had a mild orthopedic disability to his left knee and none to his right knee (Tr. at 642). Dr. Epstein ended by stating that "no future orthopedic treatment is reasonable, related, and necessary." Id.

Dr. Memoli's billing records and progress notes for the same period conflict with those of Dr. Epstein. *See, e.g.,* Tr. at 299 (with regard to Hill's left ankle, November 12, 2001, "no change on complaints / physical findings;" "still persistent intermittent pain and stiffness;" "has a moderate-marked permanent partial disability"); Tr. at 305 (with regard to Hill's left ankle, April 1, 2002, "patient returns with no

change on complaints/positive physical findings;" "still persistent intermittent pain and stiffness"); Tr. at 418 (with regard to Hill's left knee, December 17, 2001, "no change on complaints/physical findings;" "still persistent pain both knees"); Tr. at 422 (with regard to Hill's left knee, March 11, 002, same).

**Dr. Mesnick.** Dr. Mesnick conducted an examination on July 8, 2002, which occurred seven months following Hill's date last insured of December 31, 2001. With regard to both Hill's knees and ankles, Dr. Mesnick reported that "[a]ll ranges of motion [we]re normal" and that "[t]here [wa]s no pain on movement and no evidence of swelling, redness or tenderness around the joints" (Tr. at 652–53). An x-ray of the left knee showed "mild joint space narrowing" and Hill had "soft tissue swelling" in his left ankle (Tr. at 643). Dr. Mesnick concluded that Hill "[w]as mildly limited in lifting, carrying, pushing and pulling heavy objects, long distance ambulation and standing for prolonged periods of time" and that his prognosis was "good." *Id.*

By contrast, in a progress note written three months earlier on April 1, 2002, Dr. Memoli continued to state that, regarding the left ankle, Hill "return[ed] with no change on complaints/positive physical findings" and that Hill "still [had] persistent intermittent pain and stiffness [of the] left ankle" (Tr. at 305). The left ankle presented a "moderate permanent partial disability" (Tr. at 306). Likewise, with regard to the left knee, Dr. Memoli reported that Hill "return[ed] with no change on complaints/positive physical findings" and

that Hill "still [had] persistent pain [with] both knees" (Tr. at 424).

The above review reveals, conclusively, that substantial evidence in this case record conflicted with that of Dr. Memoli. First, all of the other physicians who examined Hill following his October 4, 1996 surgery opined that he had "mild" or moderate impairments (Tr. at 182, 206, 577–78, 605, 626, 643) or a partial disability (Tr. at 584)—or none at all (Tr. at 597). Second, while Dr. Memoli's progress notes provided conclusory statements related to the Hill's impairments of his left ankle, left knee, and right knee, the examining physicians detailed Hill's physical findings extensively—repeatedly reporting functioning that conflicted with that of Dr. Memoli's opinion. *See, e.g.,* Tr. at 181, 206, 570, 577–78, 597, 603, 625, 652–53.

The cue that almost always appears is Dr. Memoli continually seeking further authorizations alternately for physical therapy, medication, and follow up care during periods of time when other examining medical sources opined that further treatment was not necessary.[16] *See supra.*

As the regulations specify, a treating physician's opinion alone is not dispositive of a disability determination: it may only be given controlling weight when it is not inconsistent with other substantial record evidence and when it is "well-supported" by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2). In this Circuit, "the less consistent that [a treating source's] opinion is with the record as a whole, the less weight it will be given." *Snell,* 177 F.3d at

16. Hill testified that the physical therapy offices and Dr. Memoli's medical offices were located in the same location and were "connected" to one another (Tr. at 712). Hill's counsel (agreeing with the suggestion of the ALJ at the second hearing) stated that Hill would benefit from an independent second opinion on the need for yet another surgery (Tr. at 721 ("second opinion would not be a bad idea")). A nontreating examining medical source also voiced this view. As early as June, 1999, Dr. Bensam wrote that Hill "should be encouraged to get an orthopedic consultation independent of the State Fund and his treating orthopedic physician" (Tr. at 584).

133. Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," *Veino v. Barnhart*, 312 F.3d at 588, and "it was [thus] within the province of the ALJ to resolve" the conflicting medical evidence in the manner of the decision. *Id.* Here, on the record before the Court, the ALJ was justified in affording Dr. Memoli's opinion little, if no, weight given the great degree to which it conflicted with other substantial evidence in the record.

### 3. Compliance with 20 C.F.R. § 404.1527(d)

■ Hill further argues that the ALJ's decision does not comply with 20 C.F.R. § 404.1527(d). (Pl.'s Mem. Supp. J. Pleadings 17–18.) In instances when the Agency does not give a treating source's opinion controlling weight, this provision requires that the ALJ "give good reasons in [the] decision for the weight [the ALJ] give[s][the] treating source's opinion." § 404.1527(d)(2). The regulations set out factors to be taken into account in deciding the weight given to any medical opinion, including: (a) whether the source of the medical opinion examined the claimant, § 404.1527(d)(1); whether the source of the medical opinion has a treating relationship with the claimant and, if so, whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," § 404.1527(d)(2); the length, nature, and extent of the treatment relationship and the frequency of examination, *id.*; the degree to which "the medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings," § 404.1527(d)(3); the degree to which the treating source opinion

is consistent with the record as a whole, § 404.1527(d)(4); and, whether the treating source is a specialist in the area on which he is opining. § 404.1527(d)(5).

Here, the ALJ provided good reasons for not giving Dr. Memoli's opinion controlling weight. In a thirteen-page, single-spaced decision, the ALJ meticulously reviewed the medical evidence in the record (Tr. at 16–26). The ALJ explained that "[t]he usually mild objective clinical findings in Dr. Memoli's sparsely written [17] 1996–May 2002 clinical notes ..., and the findings and assessments in the reports in the balance of the record ... do not support" Dr. Memoli's opinion regarding the degree of Hill's impairments or a finding that Hill is entitled to disability insurance benefits (Tr. at 24). The ALJ further elaborated that Dr. Memoli's reports were "contradicted by the rest of the substantial medical evidence in the record" and thus "[we]re not accorded controlling weight and [we]re given less weight than the many other reports in the record." *Id.* Thus, the record before the ALJ "contained key medical opinions submitted by [Dr. Memoli] to the ALJ [that] were not particularly informative and were not consistent with those of several other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004).

The ALJ further stated that Dr. Memoli's opinion was not given controlling weight because his reports "[we]re not well supported" (Tr. at 24). Governing regulations state that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." 20 C.F.R. § 404.1527(d)(3). "After carefully considering the entire record and the

---

**17.** Mr. Hill's suggestion that in view of this observation of "sparseness" he should be given another chance at supplementing the record is clearly wrong. There is no way that

Dr. Memoli's contemporaneous notes could be redone. As indicated, the notes were long on symptoms, but short on physical signs, and laboratory findings—in a word, "sparse."

ALJ's opinion," *Halloran,* 362 F.3d at 32, this Court concludes that the ALJ complied with the treating physician rule and that the decision, although it does not strictly track the regulation, provides sufficiently "good reasons" for the denial of disability insurance benefits that it too complies with § 404.1527(d).

### B. Medical Listing 1.03

 Hill maintains that the ALJ committed legal error by failing to consider whether Hill met or equaled Medical Listing 1.03.[18] The record contains a form developed by Hill's counsel, which pertains to Medical Listing 1.03 and which Dr. Memoli completed on July 31, 1998 (Tr. at 227–28). In the form, Dr. Memoli stated that Hill "ha[d] marked restricted motion left knee, 10–30 degrees, with pain, swelling and popping secondary to lateral subluxing patella," that Hill "require[d] further surgery," and that Hill was "totally disabled and require[d] continued, ongoing care and surgery to [left] knee and [left ankle]" (Tr. at 227).

The ALJ's decision shows, however, that the ALJ did consider the Medical Listing 1.03 impairment in that the ALJ concluded that "there [was] no evidence that the claimant [was] not fully weight-bearing on his left leg or has significant range of motion deficits of his left knee since recovering from surgery" (Tr. at 24). Moreover, the record contains substantial evidence that Hill could ambulate effectively, *i.e.,* was "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Medical Listing 1.00B(2)(b)(2). Hill himself testified that he could walk for half an hour before having to stop to rest

(Tr. at 718). Several examining physicians noted that Hill either did not use or need a cane (Tr. at 180),[19] did not need a crutch (Tr. at 578), had a "steady" (Tr. at 180) or "normal" gait (Tr. at 597), *see also* Tr. at 652 ("The claimant can walk into the room without any difficulty, does not require the use of special equipment[;] [is][a]ble to heel and toe walk[;][and][c]an get up from [the] chair with no difficulty."), or had only a mild impairment with regard to walking (Tr. at 182, 625 ("wobbly gait ... however, no obvious limp or cane")). The Court concludes that the ALJ considered whether Hill had an impairment that met or equaled Medical Listing 1.03 and that substantial evidence in the record exists to support a finding that Hill is not entitled to benefits under this listing.

### C. Consideration of Evidence of Obesity

 Hill also argues that the ALJ committed legal error by failing to consider Hill's obesity pursuant to SSR 02–01. (Pl.'s Mem. Supp. J. Pleadings 19–21.) While the record shows that Hill's weight increased over time—starting at 200 pounds in February 1997 when Hill applied for benefits (Tr. at 157) and ending at 304 pounds on July 8, 2002 (Tr. at 651), this was not an issue that either Dr. Memoli raised even once in any of his progress notes or letters as a major factor contributing to Hill's impairments or that Hill's counsel brought out in testimony at either of the hearings. While some of the examining sources noted Hill's weight, *see, e.g.,* Tr. at 570 (stating that Hill was "quite obese," weighing 230 pounds at 6′1″), Tr. at 625 (stating that Hill was "obese," weighing at least 280 pounds), none of

---

**18.** Medical Listing 1.03 pertains to "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not

occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, App. 1.

**19.** On November 17, 1997, when Dr. Cohen examined Hill, Hill was using a cane (Tr. at 204).

them suggested or concluded that Hill's obesity contributed to any impairment to a disabling degree. The Court concludes that—in light of all of the substantial evidence in the record—the denial of benefits stands notwithstanding the evidence in the record regarding Hill's obesity.

### D. Subjective Complaints of Pain

█ Hill contends that the ALJ incorrectly evaluated Hill's testimony regarding pain and other disabling symptoms. (Pl.'s Mem. Supp. J. Pleadings 21–24.) Preliminarily, the Court notes that the record is replete with Dr. Memoli's mention of Hill's subjective complaints of pain but short on details regarding medical signs. Implementing regulations define "symptoms" as the claimant's "own description of [his] physical ... impairments" and provide that claimant's "statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528(a). By contrast, "signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements." § 404.1528(b). Regulations further govern how the Agency evaluates symptoms such as pain, and require that claimants provide evidence of "medical signs and laboratory findings which show that [the claimant] ha[s] a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the in-

tensity and persistence of [the] pain or other symptoms ... ), would lead to a conclusion [of disability]." § 404.1529.

The ALJ found that Hill's "statements throughout the record regarding his disabling symptoms and functional limitations [we]re *generally* credible, but do not support a finding that the claimant is disabled" (Tr. at 28 (emphasis added)). "Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings," *Snell*, 177 F.3d at 135 (citation omitted), and those credibility findings must be supported by substantial evidence. *Tavarez v. Barnhart*, 124 Fed. Appx. 48, 51 (2d Cir.2005) (citing *Aponte v. Secretary of Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984)). Many of the examining physicians noted that Hill moved his joints without pain (Tr. at 597 ("painless range of motion" with normal muscle strength for both the left knee and the left ankle), 626 (no complaint of pain while moving the left knee), 652 ("all ranges of motion [of the knees] are normal[;][t]here is no pain on movement"); *but see* Tr. at 205 (flexion of the left knee caused "discomfort")). Examining physicians also reported that Hill's knees were stable (Tr. at 570 ("both knees are stable"), 625 ("good stability")). Moreover, given the impairment claimed by Hill (*i.e.*, disabling functional limitations related to major weight-bearing joints), the record contained limited laboratory findings [20] and other evidence regarding the impact of the claimed disability on Hill's functioning.[21]

---

**20.** In total, the record contains reports of three mostly pre-surgical MRIs ordered by treating physicians (*i.e.*, an MRI of Hill's left knee conducted in August 1995 (Tr. at 202), an MRI of Hill's left ankle conducted on April 15, 1997 (Tr. at 321), an MRI of Hill's right knee conducted on May 29, 2001 (Tr. at 432)). Hill testified that he had had no MRIs following the 2000 surgery (Tr. at 709). Thus, no post-surgical MRIs were ordered for the left knee despite Hill's ongoing complaints. The

ALJ ordered consultative X-ray examinations of both the left knee and the left ankle, which showed mostly negative findings (Tr. at 652–53, 654). At the hearing, the ALJ had noted the importance of current laboratory findings regarding the claimed impairments (Tr. at 709–100).

**21.** The ALJ noted at the second hearing that additional evidence was required regarding the effects of Hill's claimed impairments on

Substantial evidence in the record, thus, supported the ALJ's findings concerning Hill's testimony and other evidence regarding pain and other disabling symptoms as "generally credible" but ultimately not dispositive.

### E. Findings Regarding Residual Functional Capacity

■ Finally, Hill argues that the ALJ committed legal error in not specifying the basis for concluding that Hill's residual functional capacity precluded a disability finding. (Pl.'s Mem. Supp. J. Pleadings 24.) The ALJ's decision concluded that Hill could perform sedentary work through August 2000, *see* 20 C.F.R. § 404.1567(a) (defining sedentary work, in part, as requiring walking and standing only occasionally), and light work since September 2000. *See* § 404.1567(b) (describing light work, which requires in part standing and walking for approximately six out of eight hours).

The ALJ's decision detailed the medical evidence in the record that supported this finding (Tr. at 19–21, 25–26). There was substantial evidence to support this conclusion, as time and again examining physicians concluded that Hill did not have disabling impairments that precluded him for engaging in work. (*See, e.g.,* Tr. at 182 (December 1996, moderate impairments with regard to lifting, carrying, pushing and pushing, mild impairment with regard to standing and walking, and no impairment with regard to sitting); 206 (April 1997, "mild partial disability"), 584 (June 1999, temporarily, partially markedly disabled), 578 (October 1999, "temporary [sic] partially markedly disabled," could return to work with some restrictions immediately and without any restrictions within six weeks), 597 (September 2000, "no functional disability at the present time" and Hill could "continue with activities of daily liv-

daily activities as Hill claimed to have been

ing as well as with present employment"), 605 (March 2001, no disability, merely "mild residuals"), 626 (December 2001, excellent prognosis and mild disability of the left knee), 641–42 (April 2002, mild disability of the left knee), 653 (July 2002, "mildly limited in lifting, carrying, pushing and pulling heavy objects, long distance ambulation and standing for prolonged periods of time" and "good" prognosis)).

### CONCLUSION

This Court has conducted a searching review of the record. Upon remand, the ALJ complied with both the Appeals Council Order and applicable regulations by subpoenaing all of the treating physicians' medical records and ordering consultative examinations. The ALJ's decision provides good reasons for the denial of benefits and reflects a case record where the treating physician's opinion consistently, repeatedly, and markedly conflicts with that of other substantial record evidence, including the claimant's own testimony, but especially with the numerous reports of nontreating medical sources over a long period of time.

Substantial evidence in the record supports the Commissioner's decision denying Hill disability insurance benefits. Accordingly, the Commissioner's motion for judgment on the pleadings is GRANTED and the Plaintiff's cross-motion for judgment on the pleadings is DENIED.

SO ORDERED.

bed-ridden for four years (Tr. at 724).